**Thomas BYRD, Plaintiff-Appellant,**

v.

**William P. BRISHKE et al., Defendants-Appellees.**

**No. 71-1434.**

United States Court of Appeals, Seventh Circuit.

Argued March 1, 1972.

Decided July 18, 1972.

David P. Schippers, Michael J. Mc-Ardle, Chicago, Ill., for plaintiff-appellant; Schippers, Betar, Lamendella & O'Brien, Chicago, Ill., of counsel.

Richard L. Curry, Corp. Counsel, William R. Quinlan, Marsile J. Hughes, Asst. Corp. Counsels, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, PELL, Circuit Judge, and DILLIN, District Judge.[*]

SWYGERT, Chief Judge.

This is an appeal from the granting by the district court of defendants' motion for a directed verdict in a civil rights case brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343. Plaintiff alleged in this action that the defendants, all police officers of the City of Chicago and acting under color of law, had caused personal injury to him in violation of his civil rights guaranteed by the Constitution and laws of the United States in that they had:

  a.  Found the plaintiff in an injured condition bleeding profusely from the right thigh and while in such a condition denied the plaintiff medical aid and care for approximately sixty (60) minutes.

  b.  Assault[ed] the plaintiff and beat[en] the plaintiff about the head, face, cheeks, chest, ribs, legs, thighs, and generally about his entire body with blackjacks, nightsticks, fists, feet and clubs causing the plaintiff to be severely injured.

  c.  Placed the plaintiff under arrest and . . . knowingly and falsely accuse[ed] him of the violation of the statutes of the State of Illinois, to wit:

      aggravated battery.

  d.  Placed the plaintiff in handcuffs and under arrest, forced him to walk on a wounded leg, continued to beat and harass and vilify the plaintiff and call him by filthy, obscene, and uncivil names and epithets.

  e.  While handcuffed . . . bodily throw[n] or propel[led] the plaintiff into a City of Chicago police vehicle headlong so that his face and head were caused to hit upon the floor and sides of the City of Chicago Police squadrol.

  f.  Locked the plaintiff in the Bridewell Hospital, a Police facility, in the City of Chicago for approximately forty-eight (48) hours during which time he was denied his freedom.

At the close of the plaintiff's evidence, the district judge directed the jury's verdict against the plaintiff and in favor of each of the defendants who were nonsupervisory policemen on the ground that the evidence failed to connect any of them directly with any of the improper acts alleged. Then, at the close of the evidence introduced by the remaining defendants, the district judge directed the jury's verdict against the plaintiff and in favor of all remaining defendants.

[*] District Judge S. Hugh Dillin of the Southern District of Indiana is sitting by designation.

Conceptually, this appeal raises two questions: whether the district judge used the correct standard in deciding the motion for directed verdicts and whether the plaintiff was entitled to have this cause submitted to the jury against any defendant. For the reasons which follow, we reverse the granting of the directed verdicts as to defendants Moran, Pfeiffer and Finnin and remand the cause for a new trial.

## I

The standard by which judges must determine whether to grant a directed verdict for a party to a lawsuit is well-settled. As Chief Justice John Marshall stated in Pawling v. United States, 4 Cranch 219, 220, 222, 8 U.S. 219, 220, 222, 2 L.Ed. 601 (1808), in discussing demurrers to the evidence, a historical antecedent to the motion for directed verdict: "[T]he testimony is to be taken most strongly against [the movant], and such conclusions as a jury might justifiably draw the court ought to draw." That standard of the view to be taken of the evidence has remained the same to the present. *E. g.,* Delk v. St. Louis & S. F. R. R., 220 U.S. 580, 587, 31 S.Ct. 617, 55 L.Ed. 590 (1911); Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). It has also been clear that, as the first Mr. Justice Harlan said, "Where a cause fairly depends upon the effect or weight of testimony, it is one for the consideration and determination of the jury. . . . " Phoenix Ins. Co. v. Doster, 106 U.S. 30, 32, 1 S.Ct. 18, 20, 27 L.Ed. 65 (1882); *accord,* Delk v. St. Louis & S. F. R. R., *supra* 220 U.S. at 587, 31 S.Ct. 617. We therefore direct our initial inquiry to whether the trial judge properly viewed the evidence in the light most favorable to the plaintiff and whether he refrained from weighing conflicting evidence as to which reasonable men could differ.

Now I have heard and considered all of the evidence and I conclude as a matter of law that the plaintiff has not met the test of presenting believable evidence that establishes his charge by the burden of believable evidence in this case.

\*    \*    \*    \*    \*    \*

The plaintiff's case rests upon his own testimony and that of one man by the name of Fields. Who is the plaintiff? A man convicted of a felony of such serious nature that he was sentenced to five years in the state penitentiary and who, from all the credible and unimpeached testimony, was a part of the conspiracy to extort $1,000 or control of the Little Egypt Tavern from the true owners along with a man by the name of Goode that you heard the evidence about. Who was plaintiff's star witness? Fields. Fields, the little mousey man, who became a vicious bully when he had a gun in his hand in the tavern. Those are his two witnesses. He did have one, Murph, who saw nothing and heard nothing, contrary to the plaintiff's interests, one of his drinking cronies who fell to the floor and admitted that he saw nothing of what really happened. His testimony is not worth two cents.

\*    \*    \*    \*    \*    \*

Now let us look at the defendants' evidence of what happened. Who are the witnesses of what happened? Mr. Patrick Giudice, a respected official of the United States Government with a stainless reputation. Who else? Officer Kenneth White who was home in bed after midnight, a man with a record without blemish except his own blood lost that night when he went far beyond the call of duty to protect the life and liberty and property of a citizen in the need of protection from a vicious mob of armed robbers.

We are convinced that the judge used an improper standard in granting the directed verdicts. It is clear that he viewed the evidence in the light most favorable to the defendants, who moved for the directed verdict, contrary to the proper standard. Indeed, the foregoing quotations demonstrate that he indulged in the function of weighing the relative credibility of the witnesses, which is forbidden to a judge determining a motion for directed verdict in a jury case. A comparison of his summary of the evidence with the record also reveals that he stated facts favorable to the defendant which had not been proved at trial but were merely asserted in pre-trial statements of witnesses which were not admissible at trial.

## II

We turn now to the question of whether the plaintiff presented a prima facie case requiring the submission of this cause to the jury against any of the defendants. The facts adduced at trial, viewed in the light most favorable to the plaintiff, were as follows.

The plaintiff, Thomas Byrd, went to the Little Egypt Tavern at about 4 p. m. on June 17, 1968 and stayed approximately an hour. He then left the Little Egypt, returning there at about 10:45 p. m., when he joined Pat Anderson and Clyde Shepard who were already there. Upon his return, he shot pool alone for a while and shot one game with Shepard. A friend of Byrd's, Vincent ("Murph") Michalik, arrived at about five or ten minutes after midnight of June 18 and observed Byrd playing at the pool table alone. Shortly after Michalik arrived, a man in civilian clothes entered the tavern with Gerlando Giudice, the owner, and his brother. The man, later revealed to be off-duty Chicago policeman Kenneth White, confronted Byrd at the pool table and demanded of him if he was giving the tavern owner trouble. Byrd answered negatively, stated, "I got no beef with you," and moved away from the pool table to the bar to join the Anderson woman.

Shortly thereafter, a man identified as Buddy Goode came in the front door of the tavern. He and White confronted each other, argued and both drew handguns and began firing at each other. As a result of the shooting, Goode was killed, White was seriously injured with several abdominal wounds, and Byrd, who was standing at the bar, was wounded in the right thigh. Michalik then helped Byrd out the tavern door, and Byrd began walking home, which was about two and one-half blocks away. After traveling about seventy feet from the tavern he was stopped by Officer Richard Moran who was cruising by in a police car. Moran asked Byrd what was wrong, and Byrd replied that he had received a bullet wound in the tavern. Moran then ordered Byrd to walk back to the tavern, which he did.

Moran escorted Byrd inside the tavern. Byrd stood near the tavern entrance for a short time and then went to a telephone booth near the entrance to place a call. At about this time, Byrd's friend Roy Fields entered the tavern, having heard the gunshots from his nearby home. While Byrd was talking on the telephone, several police officers whom he could not identify dragged him out of the telephone booth and told him to sit on the floor. He did so, but a few minutes later unidentified police officers grabbed him and began dragging him backwards toward a back room described as a dance hall while one officer was in front of Byrd hitting him. Police Sgt. Thomas R. Finnin followed the officers and Byrd into the back room.

In the back room, Byrd was surrounded by about a dozen officers including Sgt. Finnin, Officer Moran and Officer Allen Pfeiffer. Byrd testified that he was then struck repeatedly but could not identify which officers struck the blows. Fields testified that Sgt. Finnin was in

the back room during the time Byrd was there, and Byrd could be heard screaming. Byrd was then handcuffed and taken semiconscious to a police wagon into which he was thrown by two unidentified police officers. He was taken to the prisoners' emergency facility at Bridewell Hospital. Byrd received injuries of the head, arms, back and ribs in addition to the gunshot wound. When Fields saw Byrd later on the morning of June 18, Byrd was experiencing difficulty in walking to a restroom. He was later released from Bridewell, but he was charged with aggravated battery and had to return repeatedly to state court for trial. After several continuances upon the motion of the prosecutor, Byrd was discharged and the complaint dismissed on October 17, 1968. Also, Byrd was unable to work for some time after the incident at the Little Egypt because of headaches and back problems which he attributed to his injuries received there.

The defendants denied the veracity of the account of the incident as testified to by the plaintiff and his non-adverse witnesses. They offered testimony tending to show that plaintiff was *particeps criminis* with Goode by aiding Goode in his struggle with White in which both of the latter were shot. They also testified that Fields had entered the tavern with a gun in his hand when Goode did.

Reduced to its essential elements supportable by the record, the plaintiff's principal damage claim against the police officers is based upon the theory that, even if they did not personally participate in the violation of plaintiff's civil rights by beating him, they are liable in law for negligently or intentionally failing to protect the plaintiff from others who did violate his rights by beating him in their presence.

■ In Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), Mr. Justice Douglas stated in the opinion of the Court, "[42 U.S.C. §

1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Applying the principles of general tort law to actions brought pursuant to section 1983 may result in the imposition of liability in damages both for misfeasance and for nonfeasance. As one court has ably stated the principle of tort liability for nonfeasance:

Negligent liability generally arises in the context of affirmative action. The defendant is deemed culpable where he has acted and his acts do not conform to the standard of a reasonably prudent man as judged against the community ideal of reasonable behavior. See Prosser, Torts §§ 53, 54 (3d ed. 1964). The defendant is not usually held to be responsible for inaction. However, where the defendant is under some affirmative duty to act and he fails to act accordingly, he may be held negligently responsible for his omission. He is responsible if his omission is unreasonable in light of the circumstances. Huey v. Barloga, 277 F.Supp. 864, 872 (N.D.Ill.1967); see Symkowski v. Miller, 294 F.Supp. 1214, 1217 (E.D.Wis.1969).

A pertinent illustration of the application of the principle of tort liability for nonfeasance under section 1983 is the case of Whirl v. Kern, 407 F.2d 781 (5th Cir. 1968), cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). There, Whirl was arrested on September 9, 1962 on suspicion of felonious theft by the city police of Houston, Texas and ultimately sent to the Harris County Jail, of which Sheriff Kern was the custodian, to await trial upon indictments for burglary and theft. There was no question that Whirl was properly committed to the sheriff's custody, and it was clear that Whirl was properly held until November 4, 1962 since he was unable to post bond. On November 4, 1962 a judge of the Criminal District Court of Harris County dismissed the indict-

ments against Whirl upon motion of the prosecutor on the ground that the evidence against Whirl was "insufficient to obtain and sustain a conviction." Kern received notification in the regular course of business that charges against Whirl had been dismissed, but negligently failed to take note of that fact and act upon it. Consequently, Whirl was not released from jail until July 25, 1963 when the error was discovered by the prosecutor's office upon Whirl's request for a trial date. 407 F.2d at 785–786.

The Fifth Circuit reversed a judgment for Sheriff Kern entered upon a jury verdict, holding that negligent nonfeasance was a proper basis for the imposition of tort liability under section 1983 and finding a basis for its holding in the language of Monroe v. Pape, *supra*, 407 F.2d at 788.

■■ We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed. So, too, the same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment, for to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace. Accordingly, the plaintiff was entitled to have his case against defendants Moran, Pfeiffer and Finnin submitted to the jury upon his having offered testimony that he was beaten by unknown officers in their presence.

The judgment of the district court is reversed and the cause is remanded for a new trial.