**Russell DURHAM, Plaintiff–Appellant,**

v.

**Mahdee NU'MAN; Roy Hill; James Burke; Ricky Rhodes, Defendants,**

**Donnie Glover; George Nichols; Becky Ahlers; Nasiruddin Siddiqui; Farahieh Rabbani, Defendants–Appellees.**

No. 95–5843.

United States Court of Appeals, Sixth Circuit.

Argued June 6, 1996.

Decided Oct. 9, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 22, 1996.*

* Judge Duggan would grant rehearing for the reasons stated in his dissent.

Gail Robinson (argued and briefed), McNally & Robinson, Frankfort, KY, Russell J. Baldani (briefed), Baldani, Rowland & Richardson, Lexington, Ky , for plaintiff-appellant.

E.D. Klatte, Staff Attorney, Cabinet for Human Resources, Office of Main Counsel, Frankfort, KY, Terry L. Morrison (argued and briefed), Cabinet for Human Resources, Frankfort, KY, for defendants–appellees Donnie Glover, Becky Ahlers.

William T. Haynes, Jr., Emily A. Hoffman (argued and briefed), Cathleen A. Charters, O'Bryan, Brown & Toner, Louisville, KY, for defendant–appellee George Nichols.

Michael R. Greene (argued and briefed), Fischer, Thomas, Brophy & Shake, Louisville, KY, for defendant–appellee Nasiruddin Siddiqui.

Gregory J. Bubalo, Douglas C. Ballantine (argued and briefed), Ogden, Newell & Welch, Louisville, KY, for defendant–appellee Farahieh Rabbani.

Before: MERRITT and COLE, Circuit Judges; DUGGAN, District Judge **.

MERRITT, J., delivered the opinion of the court, in which COLE, J., joined. DUGGAN, D.J. (p. 870), delivered a separate opinion concurring in part and dissenting in part.

MERRITT, Circuit Judge.

Plaintiff Russell Durham appeals the District Court's grant of summary judgment for the five defendants in this 42 U.S.C. § 1983 suit arising out of an August, 1990, assault by hospital security officers at Kentucky's Central State Hospital. There are three sets of defendants: the nurse and hospital security officer who witnessed the beating and did nothing to stop it; the two doctors who treated the plaintiff after the beating but did not diagnose his broken arm; and the administrator of the hospital who, plaintiff claims, did not have sufficient policies to prevent violent altercations, understaffed the hospital's wards housing potentially violent patients, and failed to train the hospital staff to deal with such patients.

As to the nurse and security officer who failed to try to stop the beating, the District Court granted summary judgment because the cases that have held that a failure to intervene may be a violation of § 1983 have dealt only with police and correctional officers, not state mental health workers in a hospital for the criminally insane. The Court believed that the cases, therefore, do not "clearly establish" the constitutional duty of these defendants to try to stop the beating.

As to the second set of defendants, the treating physicians, the District Court held that the plaintiff had failed to satisfy both the objective and subjective components of the "deliberate indifference" standard by which these violations are to be judged.

As to the last defendant, the administrator of the Central State Hospital, the District Court held that there was no evidence that the defendant had implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending employees, and therefore summary judgment was appropriate.

## FACTS

Russell Durham was committed to Eastern State Hospital in February 1990 because he had been found incompetent to stand trial for assault. He was transferred to Central State Hospital in August 1990. Prior to the beating, the plaintiff was in seclusion and was shackled with a "saddle" or belt restraining him at the wrists and legs. He was placed in Unit S, the unit designated for the more unruly patients. Durham had been shackled for two days at the time of the incident. He approached the nurse's station on August 27, 1990, and asked the nurse there, Becky Ahlers, if he could go to the bathroom and then lie down. Apparently Nurse Ahlers had a policy that patients in seclusion could only go to the bathroom during fifteen minutes every

** The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

hour. If the patient cannot wait and relieves himself in his clothes, he is punished.

Nurse Ahlers claims that she did not hear Durham's request, but he claims that she refused his request. The plaintiff then urinated on himself and on the floor in front of the Nurse's station and walked back down the hall to the activity room, tracking urine with him as he went.

Mahdee Nu'Man, one of the Hospital Security Officers, and Nurse Ahlers determined that Durham should be made to clean up the urine. Durham refused to clean up the urine, and Ahlers ordered Nu'Man to put Durham in seclusion as punishment for not cleaning up his mess. Durham apparently kicked at Nu'Man at this point, and Durham claims that Nu'Man then grabbed him and forced him to the floor. Durham claims that another officer, Ricky Rhodes, repeatedly picked Durham up by his shackles and dropped him back onto the floor. Durham also says he was kicked and kneed. A third officer, Donnie Glover, who admits being present during the incident, denied that Nu'Man or Rhodes kicked or beat Durham at all. He swore that they were only trying to restrain him. Therefore, under Durham's account of the incident, Glover stood by and did nothing while he was beaten by Nu'Man and Rhodes. In addition, officer Roy Hill testified that Glover was actively involved in the incident, and that he assisted in lifting Durham. Nurse Ahlers also testified that she thought that Glover was in the activity room during the incident.

Nurse Ahlers admitted seeing some of the fracas which occurred between Nu'Man, Rhodes and Durham, initially from the monitor at the Nurse's Station, and then later from the doorway of the activity room. Officer Roy Hill testified that Ahlers could see into the activity room during the incident. At no time did Nurse Ahlers or Donnie Glover attempt to put an end to the incident by intervening or by calling for help.

After the incident, Dr. Rabbani was called to attend to Durham. She was the psychiatrist on duty at the time of the incident. When she first saw Durham, she said "My God ... what happened?" Dr. Rabbani sutured the cut over Durham's eye. Nurse Judkins, who was present at the time, testified that Durham told her and Rabbani that his arm was broken. Dr. Rabbani testified that she asked Durham if his arm was in pain, and he said it was not. Apparently Dr. Rabbani did examine his arm even though Durham allegedly denied having pain. Although she noted a linear abrasion, she did not notice any discoloration or bruising, and did not order an X-ray. Judkins testified that Durham, when questioned if his arm was in pain said "hell yes it hurts." Ahlers also examined Durham's arm, and Durham also told her that it was broken. After the examination, Durham was placed in more severe shackles in seclusion.

The next day, Dr. Siddiqui, the plaintiff's regular doctor (also a psychiatrist) examined the plaintiff. Dr. Siddiqui made notes about the surface injuries to the plaintiff's arm, but the plaintiff nonetheless claims that the doctor did not examine his arm. At 1:30 p.m. on the following day, August 29th, Durham complained of a broken arm. No doctor saw the plaintiff that day. The next morning, the plaintiff again complained of the pain, and stated that he thought his arm was broken. Although the plaintiff asserts that the interdisciplinary progress notes do not state that there was an exam by Dr. Siddiqui on the 30th, Dr. Siddiqui testified that he noted some swelling and then ordered an X-ray of the plaintiff's arm.

The X-ray revealed that Durham had a broken arm. Dr. Steven Henry, the plaintiff's treating physician at Humana, described his injury as a "Night-stick" fracture. He also testified that it would be normal for swelling not to occur for the first 24–36 hours and that it is common for X-rays not to be taken immediately for these types of injuries. The plaintiff's arm was casted, and then recasted. Finally, a metal plate was inserted to aid in the healing process. The arm apparently healed.

The plaintiff also asserts a claim against the supervisor of the hospital, Nichols. Units R and S of the Central State Hospital in the Grauman Building were opened in 1989 to deal with patients who have a potential to be more violent. Plaintiff asserts that

Unit S, where the plaintiff was a patient, was understaffed. He also attacks the adequacy of the training offered at Central State Hospital. Officers were only required to have the equivalent of a high school education and be able to read and write and have passed the Driver's test. They were not required to have any prior experience with psychiatric patients. Although there was a two week training session, only four and one half hours of that training were devoted to the treatment and care of potentially violent patients or the proper use of restraints and seclusion. In addition, this training was conducted by correctional personnel, and not by mental health personnel. There was also no annual re-training until after the incident at issue in this case.

## ANALYSIS

### I. The Liability of the Nurse and Security Officer for Failure to Intervene

 Our review of a grant of summary judgment is *de novo*. Summary judgment is only appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). All facts, as well as all inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd., et al. v. Zenith Radio Corp., et al.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

 The doctrine of qualified immunity protects government officials in civil cases from damages liability, *Rich v. Mayfield Heights*, 955 F.2d 1092, 1094 (6th Cir.1992), if their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For a right to be "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that his or her conduct violates that right. The unlawfulness of the

official or employee's conduct must be apparent in light of pre-existing law. *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir.1991). A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred. *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir.1988). The law requires that,

> [T]hose decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir.1988).

*Bruner v. Dunaway*, 684 F.2d 422 (6th Cir.1982), guides our reasoning in this case. There, the Court held that "it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff." In *Bruner*, the plaintiff was asleep in his car when he was awakened by a police officer of the city of Knoxville, Tennessee and asked to exit his vehicle. Plaintiff Bruner testified that he was then struck repeatedly with a flashlight or a club. After fleeing the scene of the first beating, Bruner was confronted by a reserve police officer in an alley, and was repeatedly struck and kicked by other unidentified persons as he was dragged down the alley. There were eight defendants in *Bruner*, all of whom admitted that they were present during the various stages of the incident. The jury returned a verdict for Bruner, but on motion of the defendants, the District Court set aside the verdict on the ground that in order to be held liable under § 1983, personal involvement must be shown. After a second trial, the jury found for Bruner as to three of the defendants, found against Bruner as to two of the defendants, and the Court directed a verdict as to the remaining three defendants. On appeal, Bruner argued that even if the evidence did not demonstrate personal involvement as to

some of the officers, the inaction of the "non-participating" officers while Bruner was being assaulted subjected those officers to liability. *Bruner*, 684 F.2d at 424. In holding that the officers who stood by and did nothing while Bruner was beaten by other officers could be held liable, the *Bruner* court relied on *Smith v. Ross*, 482 F.2d 33 (6th Cir.1973) (per curiam). In *Smith*, although the Court found that a deputy's acts were not the cause of the harm suffered by plaintiffs, the Court stated that "a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly", and "acts of omission are actionable in this context to the same extent as acts of commission." *Smith*, 482 F.2d at 36.

The *Bruner* court also relied on *Byrd v. Brishke*, 466 F.2d 6 (7th Cir.1972). The plaintiff in *Byrd* testified that unidentified officers beat him in the back room of a tavern. Byrd was able to identify three officers who were present at the time of the beating, though he was unable to identify those who actually beat him. The district court directed a verdict for the defendants at the close of evidence, and the Seventh Circuit reversed on appeal, holding that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Id.* at 11.

In *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir.1990), the Court applied *Bruner* to the "prison context" and held that "a correctional officer who observes an unlawful beating may, nevertheless, be held liable under § 1983 without actively participating in the unlawful beating." *McHenry*, 896 F.2d at 188. "[E]ven if one or more of the officers did not actively participate in the beating, they still owed McHenry a duty of protection." *Id.* In *McHenry*, the prisoner was serving a nine-year sentence at Brushy Mountain Prison. On two separate occasions, he was taken from his cell and led to remote parts of the prison where he was confronted by corrections officers about stealing from one inmate and threatening the

life of another. On the first occasion, one corrections officer taunted him, twisted his arm, and threw him to the ground while approximately five other corrections officers were present. McHenry filed a complaint about the incident, and the next morning, the same corrections officer removed him from his cell and escorted him to the prison hospital. Five other officers were also present during this incident. One officer, after putting on leather gloves, struck McHenry in the back, causing him to fall to the floor and hit his head on the wall. The other officers then "rushed into the holding cell and proceeded to strike McHenry in the back, stomach, and legs; including Lonnie Daugherty who struck McHenry's leg with a billy club." *Id.* at 186.

The jury returned a verdict for McHenry on his § 1983 suit for deprivation of civil rights, and the District Court denied the defendants' motions for judgment notwithstanding the verdict or in the alternative for a new trial. On appeal, the Court affirmed the District Court's refusal to grant a new trial or judgment notwithstanding the verdict, holding that the trial court had properly instructed the jury that under *Bruner*, a corrections officer who observes an unlawful beating may be held liable under § 1983 even though he or she did not actively participate in the unlawful beating.

Although there has not yet been a case in this Circuit specifically holding that a hospital security officer can be held liable under § 1983 for failing to protect a patient or inmate from being beaten by another hospital security officer, it is not necessary that there be a specific holding in order to find that a constitutional rule in the § 1983 area has been "clearly established." It is sufficient that the case law "both point[s] unmistakably to the unconstitutionality of the conduct complained of" and that "applicable direct authority ... leave[s] no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Ohio Civil Serv.*, 858 F.2d at 1177.

In this case, Glover is a hospital security officer. The facility is a state-run mental health hospital. The plaintiff was held in

custody in the wing of the hospital reserved for patients who were prone to violence. The plaintiff himself was in the Central State Hospital instead of in prison because he was found incompetent to stand trial. Others in the Hospital are criminally insane as well.

As a hospital security officer, Glover is analogous to the police officers in *Bruner* and the corrections officers in *McHenry*. Just as the police officers in *Bruner*, the hospital security officers have a badge of authority; they keep the peace in the Central State Hospital. Just as the corrections officers in *McHenry*, the hospital security officers have a duty to protect inmates or patients from assault by other officers. Just as the plaintiffs in both *McHenry* and *Bruner*, Durham was totally dependent on the staff, both security and medical, of the Central State Hospital. The circumstances of the incident in this case evidence the custodial nature of the facility. Durham was in shackles when the assault took place. He was unable to defend himself against the attacks of Mahdee Nu'Man and Ricky Rhodes. A jury could conclude on the basis of the disputed facts that Glover should have come to Durham's aid, instead of standing idly by, allowing the assault to continue unfettered. The decision of the District Court as to defendant Donnie Glover is therefore REVERSED.

Taking the evidence in the light most favorable to plaintiff, it was Nurse Ahlers who initially refused Durham's request to go to the bathroom. After Durham urinated on the floor, it was Nurse Ahlers who directed Mahdee Nu'Man to tell Durham he must clean it up or face being placed back in seclusion. Her orders caused the conflict, and then when the conflict flared, she stood idly by and watched the beating. Charged with the responsibility of taking care of patients, Nurse Ahlers became angry, shirked her responsibilities and allowed a patient in her care to be brutally beaten by hospital security officers. She watched the beating unfold on her monitor from the nurse's station, and then from the doorway of the activity room, the room where the beating took place. The beating lasted approximately ten minutes, according to Nurse Judkins. Judkins stated that she went up to the main desk at the beginning of the incident and when she returned about 10 minutes later, Durham was in seclusion. This time period was long enough for Nurse Ahlers to have been able to make a difference, either by directing the hospital security officers to stop their attack, or by calling security from the main building of the hospital. Coming to Durham's aid would not have required her to become physically involved in the incident.

Because the precedent holding police officers and correctional officers liable for failure to intervene was sufficient to place the nurse who caused the conflict on notice that she had a duty to protect plaintiff while under her charge, the judgment of the District Court granting summary judgment to defendant Nurse Becky Ahlers is therefore REVERSED.

## II. The Liability of the Doctors

In the case of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court established the standard for determining whether the facts alleged in a prisoner's complaint for improper medical care constitute a valid civil rights claim. In *Estelle*, the Court held "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. at 292. The *Estelle* Court also held that "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,' " *id.* at 105–6, 97 S.Ct. at 292, and that negligence or "medical malpractice" alone is insufficient to establish liability.

Especially relevant to this case, which involves the failure to order an X-ray of plaintiff's arm to enable the physicians to diagnose his broken arm, is the language from *Estelle* that "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment," and "at most ... it is medical malpractice." *Id.* at 107, 97 S.Ct. at 293.

In granting summary judgment to Drs. Siddiqui and Rabbani, the Magistrate Judge stated:

> The lack of outward symptoms of a broken arm, plaintiff's alternating between claims of having a broken arm and denial of pain, the numerous times his arm was examined by medical personnel, and the medical evidence that the sort of fracture plaintiff suffered does not immediately cause swelling or bruising leads the Magistrate Judge to conclude that there is no genuine issue of material fact as to the objective component of the standard for deliberate indifference. While his injury was undeniably serious, it was not obvious. The physicians may have been negligent in failing to diagnose and treat plaintiff's arm in a timely manner, but medical negligence does not rise to the level of a constitutional tort.

The Magistrate also found that there was no genuine issue of material fact as to the subjective component of the deliberate indifference analysis:

> Plaintiff has also failed to raise a genuine issue of material fact regarding the subjective component of "deliberate indifference," i.e. a culpable state of mind on the part of the defendants. There is no evidence that Dr. Siddiqui or Dr. Rabbani acted with obduracy or wantonness toward plaintiff or that they *intentionally* withheld medical care they knew to be necessary.

*Id.*

■ The deliberate indifference test contains two components. The first is an objective one: Was the deprivation sufficiently serious? The second has a subjective element: Did the official act with a sufficiently culpable state of mind? *See Caldwell v. Moore*, 968 F.2d 595 (6th Cir.1992).

■ The Magistrate's view of the case is correct. While Durham's broken arm was clearly a "serious medical need," it was not readily apparent that the arm was broken, and he did receive medical attention after the incident. He received sutures for the cut above his eye, and an examination was done of his arm. The broken arm was not displaying any swelling, and so it was not unreason-

able or wanton for the two physicians to fail to diagnose that it was broken until several days later.

As to the culpable state of mind requirement, there is no evidence to suggest that either Rabbani or Siddiqui acted with wantonness. The Plaintiff's complaints go to the adequacy of the medical care; they do not raise an issue of unnecessary and wanton infliction of pain as required under *Estelle*. They were not deliberately indifferent to a serious medical need of the Plaintiff. The District Court grant of summary judgment as to these two defendants is therefore AFFIRMED.

### III. The Liability of the Hospital Administrator

The District Court, in granting the defendant Nichols' motion for summary judgment, stated:

> The established law is clear that someone in a supervisory capacity, as Nichols was, must have at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending employee. *See Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir.1989) and *Hays v. Jefferson*, 668 F.2d 869 (6th Cir. 1982). There is nothing in the record to show that this defendant implicitly authorized, approved, or knowingly acquiesced in any of the conduct which forms the basis of this complaint. It is clear to the Court that the defendant Nichols should be dismissed from this action.

■ The plaintiff asserted in his brief that Nichols had not been deposed because the lower court would not permit discovery relevant to the claims against Nichols prior to the ruling on the motion for Summary Judgment. In fact, Nichols was deposed on August 24, 1993, after the trial court granted his motion for summary judgment. Since oral argument, Durham's counsel has withdrawn the argument that the claim against Nichols should be remanded to permit discovery, including Nichols' deposition. There is nothing in the record to show that this defendant implicitly authorized, approved, or knowingly acquiesced in any of the conduct which forms the basis of this complaint. Mr.

Nichols was deposed, and that deposition shows no knowledge or authorization in the conduct at issue here. The plaintiff does not suggest that there was any evidence to the contrary. The District Court grant of summary judgment was therefore appropriate and is hereby AFFIRMED.

For the reasons stated above, the judgment as to defendants Glover and Ahlers is REVERSED, and the judgments as to the other three defendants are AFFIRMED.

DUGGAN, District Judge, concurring in part, and dissenting in part.

I concur with the majority except with respect to Nurse Ahlers. While I agree that the evidence, viewed in a light most favorable to plaintiff, could lead a jury to conclude that Nurse Ahlers had the opportunity and ability to prevent the beating, I am not persuaded that she had a "clearly established" duty to do so. I am aware of no precedent from this or any other court that has imposed liability on an individual (other than a police, correctional or security officer) for his or her failure to intervene, simply because he or she was, arguably, in a position to have prevented the beating.[1]

The doctrine of qualified immunity is intended to shield from suit those officials whose wrongful conduct[2] was not clearly established as a constitutional violation at the time the conduct occurred. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right. To be outside the scope of qualified immunity, the very action in question need not have previously been held unlawful, but the unlawfulness must be apparent in light of pre-existing law." *Thomas v. Whalen*, 51 F.3d 1285, 1289–90 (6th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 518, 133 L.Ed.2d 426 (1995). *See Walton v. City of Southfield*, 995 F.2d 1331, 1335–36 (6th Cir.1993).

While Nurse Ahlers' inaction was, at the very least, improper, I do not believe that it was "clearly established" that her failure to intervene would be deemed a *constitutional* violation. Because I do not believe that any decisions from this Court, or any other court for that matter, outline "the contours of the right" in a sufficiently clear manner so that a reasonable official in Nurse Ahlers' position would understand that what she was doing (or not doing) violates a constitutional right, *see Whalen* and *Walton*, I believe that Nurse Ahlers is entitled to qualified immunity. I would therefore affirm the District Court's decision with respect to her.

---

1. I agree with the majority that defendant Glover, a security officer, occupies a "law enforcement" position and thus is not entitled to qualified immunity.

2. In discussing the issue of "immunity", we assume that the conduct was "wrongful"; otherwise, there would be no need to discuss the issue of immunity.