NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0200n.06

No. 17-1551

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RALPH PELTON, | ) | **FILED** |
| | ) | Apr 17, 2018 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ALEX PERDUE, JACOB PIFER, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

BEFORE: NORRIS, BATCHELDER, and STRANCH, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge**. On the night of November 28, 2015, Sergeant Pifer of the Lewanee County Sheriff's Department tackled an elderly man, Ralph Pelton, in front of Pelton's home. The tackle fractured Pelton's pelvis and broke multiple ribs. As Sergeant Pifer tackled Pelton, Corporal Perdue, of the same department, stood nearby without intervening. The misfortune of Pelton's encounter with these officers of the Lewanee County Sheriff's Department is underscored by the fact that the entire incident was predicated on a mistake: the officers, responding to a report of domestic violence involving a gun, incorrectly determined that Pelton's home was the location of the reported domestic violence.

Seeing police surround their home, Pelton and his fiancée, Rose Thompson, went outside to confront the officers. They were greeted by officers, with guns drawn, shouting orders. A brief verbal exchange marked primarily by confusion and frustration escalated into the physical confrontation that forms the basis of Pelton's present suit against Sergeant Pifer and Corporal

Perdue for unreasonable seizure, against Sergeant Pifer for the use of excessive force, and against Corporal Perdue for failure to intervene to stop that use of force.

The officers moved in the district court for summary judgment, arguing that they are immune from civil suit. The district court denied their motion and they appealed. For the reasons stated below, we **AFFIRM** the district court's denial of the defendants' motion for summary judgment on the claim that the officers unreasonably seized Pelton and on the claim that Sergeant Pifer used excessive force against Pelton. We **REVERSE** the district court's denial of summary judgment on the claim that Corporal Perdue failed to intervene to stop Sergeant Pifer from tackling Pelton.

## I.

On November 28, 2015, dispatch in Lewanee County, Michigan, received a report from Arturo Cooper of a domestic-violence incident occurring at a neighboring home.[1] Cooper reported to dispatch that a man was pointing a gun at a woman. Staying on the line with dispatch as officers were sent to the scene, Cooper also reported that (1) the man was wearing a white hat; (2) the man was in his own yard and appeared to be taking his dogs inside; (3) Cooper could see the back porch lights of the suspect's home; (4) a white truck and a green car were parked outside the suspect's home; (5) the suspect's home was tan; and (6) the suspect's home was located to the right of Cooper's home at 190 Reed Street if someone was looking at Cooper's home from the street. There does not appear to be any dispute for purposes of this appeal that

---

[1] The facts referenced here come from the parties' "Joint Statement of Facts for Defendants' Motion for Summary Judgment." Based on the transcript of the district court's hearing on Defendants' Motion for Summary Judgment, the court relied exclusively on the Joint Statement in denying Corporal Perdue and Sergeant Pifer qualified immunity. ("The Court: You did a very good job on the statement of material facts not in dispute, and the statement of material facts not in dispute, et cetera, et cetera, under the circumstances of this case suggests that at minimum a jury has to resolve it.").

Corporal Perdue and Sergeant Pifer (referred to collectively as the "officers" or "appellants") were aware of this information when they arrived at Pelton's home.[2]

Corporal Perdue and Sergeant Pifer were near Cooper's home when he called dispatch, and they were the first to arrive on the scene. They drove into the neighborhood with their police lights off and immediately noticed a tan residence on the corner of Reed and Elkington streets where two occupants were looking out the window at the officers. Corporal Perdue saw a single light-colored SUV in Pelton's driveway. The officers believed that they had "lost the element of surprise" and had "bl[own] the cover" when they arrived, and they stopped right in front of the residence. The residence was Pelton's and was not the location of the reported domestic-violence incident. When Corporal Perdue and Sergeant Pifer stopped, they heard a dispatch report that the male suspect was outside the home. Sergeant Pifer observed Pelton's fiancée's daughter standing outside the SUV and then walking into Pelton's home. Based on the color of the residence, the observation of the occupants in the window, and the presence of the woman outside the residence, Corporal Perdue and Sergeant Pifer decided that Pelton's home was the location of the reported domestic-violence incident and they took positions around the residence.[3] Corporal Perdue took cover behind the vehicle, and Sergeant Pifer covered the back door.

---

[2] While the briefs are unclear on this point, at oral argument counsel for the defendants conceded for purposes of the argument that the officers were aware of the information provided by Mr. Cooper to dispatch.

> Judge Norris: "What did the officers know of those items that Mr. Cooper related? Did they hear everything from the 9-1-1 call?"

> Mr. Douglas J. Curlew: "I can't be absolutely certain. I had the same question as I was reading through materials. Did they absolutely hear everything? In his deposition Perdue said that he pretty much had heard all of the things as counsel threw him questioning him, so for the purposes of the argument, I'm kind of making the assumption that they heard all those things. The dispatcher was talking."

[3] The officers also state that they believed the residence to be the location of the reported domestic-violence incident because it was to the right of Cooper's home. How the officers came to that conclusion is unclear in light of the fact that they did not know which home was Cooper's when they stopped.

While the officers waited for backup to arrive, Pelton's fiancée, Rose Thompson, came out of the home. Corporal Perdue pointed his weapon at her, and she yelled at the officers, demanding to know what they were doing at her home. Neither of the officers answered Thompson's questions, but commanded her to show her hands and exit the front porch. Thompson eventually obeyed.

Pelton then came to the door and began yelling at the officers, demanding to know why they were at his home. Corporal Perdue turned his weapon on Pelton, and the officers noticed a small dark object in Pelton's hand. Sergeant Pifer determined the object to be a remote control or a telephone. Sergeant Pifer "knew [the object] was not a gun," but moved to the front of the residence to assist. When Sergeant Pifer moved to the front of the residence, Corporal Perdue was "a couple feet" behind him. Corporal Perdue never believed that the object was a gun. Pelton continued ask the officers why they were there; the officers commanded him to put down the object and raise his hands, and they did not answer his questions. The officers did not ask Pelton if he was armed, or ask him to lift up his shirt to see if he had a gun in his waistband. Pelton eventually put down the item, continuing to ask why the officers were at his home. The officers still refused to answer Pelton's questions, and Pelton told the officers something to the effect of, "[i]f you want me, come up here and get me." Sergeant Pifer then stepped onto Pelton's porch and grabbed Pelton's arm, attempting to bring him down the porch steps. Corporal Perdue advanced forward so that he was close behind Sergeant Pifer. Pelton jerked his arm away from Sergeant Pifer and turned away from him. Sergeant Pifer testified that, at that point, he was afraid Pelton was going for a gun, either in his waistband or inside the house, and

he stepped onto the porch and tackled Pelton. In so doing, the 6'4 and 320 lbs Sergeant fractured

Pelton's pelvis and several ribs.[4]

Pelton filed a § 1983 suit against officers Pifer and Perdue in the U.S. District Court for

the Eastern District of Michigan alleging, as relevant for this appeal: (1) both officers Pifer and

Perdue unreasonably seized Pelton; (2) Sergeant Pifer used excessive force against Pelton;

(3) Corporal Perdue failed to intervene in Sergeant Pifer's use of excessive force against Pelton.

Officers Perdue and Pifer moved for summary judgment on all three claims on the basis of

qualified immunity. After a hearing, the district court denied the officers' motion. The officers

timely appealed.

## II.

In the performance of discretionary functions, government officials are immune from

standing trial for civil liability unless their actions violate clearly established rights. *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982). In bringing a § 1983 claim, it is the plaintiff's burden to

show that the defendant-official being sued is not entitled to qualified immunity. *Quigley v.*

*Tuong Vihn Thai*, 707 F.3d 675, 681 (6th Cir. 2013). To overcome a defendant's motion for

summary judgment on grounds of qualified immunity, a plaintiff must show that (1) the

defendant violated a constitutional right and (2) that right was clearly established. *Id.* at 680.

The evidentiary burden for that showing at the summary judgment phase requires sufficient

evidence to create a "genuine issue of fact," that is, "evidence on which [a] jury could reasonably

find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the district

court determines that a reasonable jury, looking at the plaintiff's evidence, could find that the

---

[4] Sergeant Pifer conceded that Pelton appeared to him to be 5 feet, 10 inches tall, weighing approximately 210-220 lbs and in his early 50s.

defendant violated a clearly established right, then the defendant's motion for summary judgment should be denied. *Cf. Quigley*, 707 F.3d at 681.

A denial of summary judgment is generally not considered an appealable "final issue" under 28 U.S.C. § 1291. A "denial of a claim of qualified immunity," however, "to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291" *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We may hear an appeal challenging the "district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established. *Diluzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (*citing Mitchell*, 472 U.S. at 530). Likewise, we can review a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed uncontroverted record evidence or whether a district court's factual determination is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.*; *Scott v. Harris*, 550 U.S. 372, 380 (2007).

None of which is to say that we may decide an appeal challenging the district court's determination of "evidence sufficiency, *i.e.* which facts a party may, or may not, be able to prove at trial." *DiLuzio*, 796 F.3d at 609 (citation omitted). Such challenges are unsuitable because they lack "any issue of law" and therefore do not "present a legal question in the sense in which that term was used in *Mitchell*." *Id.* (citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014). Often appellants in this context intertwine appropriate legal challenges with inappropriate factual challenges. When that happens, we can "ignore the defendant's attempts to dispute facts and nonetheless resolve the legal issue." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005). As a practical matter, this means that we defer to the district court's findings of fact and ideally need not look further than the district court's opinion for the facts adopted by the

court. Of course the defendant-appellant is also permitted to point elsewhere in the record to evidence presented by the plaintiff or some incontrovertible record evidence. *DiLuzio*, 796 F.3d 611 (citing *Scott*, 550 U.S. at 380). The plaintiff-appellee is likewise entitled to point to additional record evidence in support of the district court's denial of summary judgment. *Id*. The lodestar of this inquiry is this: "we must make the *legal* determination of whether the defendant violated a clearly established right, based on . . . 'the relevant set of facts and draw[ing] all inferences in favor of the nonmoving party *to the extent supportable by the record*." *Id*. (citing *Scott*, 550 U.S. at 381 n.8). Where the district court does not make clear which facts were relied upon, we "may have to undertake a cumbersome review of the record to determine what facts the district court . . . likely assumed." *Johnson*, 515 U.S. at 319.

## III.

The district court's order denying summary judgment did not adopt or reference any facts, but it is clear from the transcript of the summary judgment hearing that the judge relied on the parties' Joint Statement of Facts for Defendant's Motion for Summary Judgment ("Joint Statement of Facts"). **[R. 25]** Thus, following the unique standard of review outlined above, we look to the Joint Statement of Facts except where the officers otherwise indicate to us some additional evidence that is either incontrovertible or presented by the plaintiff that supports their motion for summary judgment.

In their briefing before this court, the officers do advert to additional evidence in the record, consisting mostly of deposition testimony from officers Pifer and Perdue. We do not credit that testimony as it is neither incontrovertible nor evidence put on by the plaintiff—in short, a reasonable juror may discount it entirely. Secondly, officers argue that evidence presented by the plaintiff to the district court below does not actually create genuine disputes

over material facts. But the officers' arguments from the record ask this court to adopt *their* interpretation of the record evidence, which is exactly the kind of fact-based argument that is precluded by our jurisprudence on this kind of appeal.[5] Therefore, because the officers do not otherwise claim that the district court improperly assessed uncontroverted record evidence or made a factual determination blatantly contradicted by the record,[6] we review their claims in light of the record as presented in the Joint Statement of Facts, drawing all reasonable inferences in favor of Pelton.

**A.**

**The district court did not err in denying the officers qualified immunity against Pelton's claim of unreasonable seizure.**

"[A]n officer may seize an individual without offending the Fourth Amendment if the 'officer has reasonable suspicion that criminal activity may be afoot.'" *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012) (quoting *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008)). Reasonable suspicion is a "particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts." *Id.* (quoting *Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006)). "We determine whether an officer has the requisite quantum of proof by looking at the totality of the circumstances." *Id.* (citing *United States v. Galaviz*, 645 F.3d 347, 353 (6th Cir. 2011)). "Pertinent circumstances include the

---

[5] To the extent, then, that "Defendants are essentially asking this Court to cast aside the factual disputes and accept as credible their versions of the facts" we agree with Pelton that we lack jurisdiction. "But rather than dismiss the appeal outright, however, we will instead discard the fact-based or 'evidence sufficiency' portion of the arguments . . . and exercise the jurisdiction we do have to reconsider the district court's legal determinations." *McDonald v. Flake*, 814 F.3d 804, 814 (2016).

[6] The Appellant's Brief does reference the fact that the district court misstated the record at the conclusion of the summary judgment hearing by saying of officers Pifer and Perdue: "They weren't looking for anyone that brandished a gun." However, Judge Cohn was immediately apprised of his misstatement and it did not alter the court's ultimate judgment. Additionally, the parties agree in the Joint Statement of Facts that officers Pifer and Perdue were responding to a call to dispatch regarding domestic violence involving a gun. The summary judgment hearing, therefore, does not indicate that the court ruled based on a misapprehension of the record and, in any event, our review is based on Joint Statement of Facts, rather than an off-hand comment from the hearing transcript.

officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *Id.* (quoting *Campbell*, 549 F.3d at 371).

The district court determined that there was a genuine dispute of material fact regarding the reasonableness of Pelton's seizure. Looking to the Joint Statement of Facts in a light favorable to Pelton, we agree. A reasonable juror could find that the officers had insufficient evidence to constitute reasonable suspicion when they seized Pelton, and thus that their seizure violated his Fourth Amendment rights. A juror might well find that the officers lacked reasonable suspicion to seize Pelton because, prior to arriving at his residence, they received a number of specific pieces of information that should have indicated to them that they were at the wrong residence. For instance, they were told (1) that the suspect was wearing a white hat, but Pelton was not wearing a white hat; (2) that a green car and white truck were in the driveway, but the only car in the driveway was a light-colored SUV; (3) that dogs were at the residence, but there was no evidence of dogs at the Pelton residence; (4) that the male suspect was outside and then entered the home, but the only person who was outside the Pelton home and then entered it was Megan Thompson, a female; (5) that the suspect's residence was to the right of 190 Reed (the informant's address), but the officers admit they did not know which house was 190 Reed before surrounding Pelton's home; and (6) the informant, Cooper, was available to provide additional information as the officers approached the Pelton residence, but the officers did not ask for additional confirming information.

The officers maintain that the record establishes that they had reasonable suspicion to seize Pelton because they were relying upon information provided by a reliable informant (Cooper) in an emergency situation (domestic violence involving a gun) and that when they

came upon the Pelton residence it corresponded to Cooper's description in color (it was "tannish") and location (to the right of Cooper's residence) and that they saw a man and a woman looking out of the window. A reasonable juror, however, could reach the opposite conclusion. At the outset we note that the reliability and availability of the informant cuts both ways. Pelton, too, views the informant Cooper as reliable—he argues that not only should the officers have relied on the information Cooper provided, they should have paid *more* attention to it. And while neither party denies that this was an emergency situation, the urgency might simply underscore for a juror the carelessness of the officers' decision to stop at the Pelton residence when there were so many indications that they were at the wrong home. Looking at the totality of the circumstances—including the evidence cited by the officers—a juror would not be unreasonable to find that the officers lacked reasonable suspicion to conduct an investigatory stop of Pelton.

## B.

**The district court did not err in denying qualified immunity to Sergeant Pifer against Pelton's claim of excessive force.**

A reasonable juror could find Sergeant Pifer's use of force on Pelton was excessive. The Fourth Amendment "protects individuals from the use of excessive force during an arrest or investigatory stop." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). To determine whether force was excessive, the court "appl[ies] an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Three factors guide the reasonableness test: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [the suspect] is

actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396).

However, as Pelton points out, a juror need not even apply the *Graham* factors in considering the evidence to find that excessive force was used against Pelton. If a juror could reasonably conclude that the investigatory stop of Pelton was unreasonable because the officers should have known that they were not at the right home, *see* Part III.A., then that juror could reasonably conclude that the officers "had a duty to retreat and the need for the application of force, absent other factors, would be non-existent." *Pray v. City of Sandusky*, 49 F.3d 1154, 1160-61 (6th Cir. 1995).[7]

Sergeant Pifer does argue, however, that "[an]other factor" justifying force was present. He claims that protecting officer safety and the safety of others created a reasonable basis, independent of their reasons for the investigatory stop, to tackle Pelton. Looking at the Joint Statement of Facts and drawing all reasonable inferences in favor of Pelton, this argument, too, fails. At the outset, it will not suffice for Sergeant Pifer to say that he and Corporal Perdue were justified because they were responding to a call involving a suspect brandishing a gun. We concluded above that a reasonable juror could find that the officers lacked reasonable suspicion to believe that Pelton was the suspect identified by Cooper in his 9-1-1 call. Viewed in a light favorable to Pelton, we must likewise assume that a reasonable juror could find that Sergeant Pifer's concern that Pelton had a gun was unreasonable. Indeed, Sergeant Pifer acknowledged that he knew that Pelton did not have a gun in his hand when they encountered him.

---

[7] Defendant-Appellants' efforts to distinguish *Pray* from the facts of this case are unavailing. While *Pray* did not involve an emergency situation, defendant-appellants cited no rule that an otherwise excessive use of force during an unreasonable investigatory stop is rendered appropriate by an emergency situation. We decline to adopt such a rule. If a juror could find the stop itself unreasonable, then, absent additional justification, a juror could find the use of force during the stop excessive.

Sergeant Pifer's argument, then, is reduced to the claim that Pelton illicitly resisted when Sergeant Pifer grabbed ahold of his arm. Sergeant Pifer did not tell Pelton that he was placing him under arrest, and indeed, Pifer had no intention at this point of doing so. Pelton "reflexively pulled his arm away from Sergeant Pifer and turned toward his sliding glass door after Sergeant Pifer grabbed at him." Sergeant Pifer attempts to shoe-horn these facts into a *Graham* "resistance" factor, but the cases he quotes speak to resisting *arrest*, not being physically uncooperative with an unreasonable investigatory stop. *Graham*, 490 U.S. at 396 (explaining that "reasonableness" is determined by reference to many factors including "whether [the arrestee] is actively resisting *arrest* or attempting to evade *arrest* by flight") (emphasis added); *Rudlaff v. Gilispie*, 791 F.3d 638, 641 (6th Cir. 2015) ("[o]ur cases firmly establish that it is *not* excessive force for the police to tase someone . . . when the person is actively resisting *arrest*") (emphasis added) (citations omitted).[8]

The bottom line here is that, in response to Pelton's pulling his arm away from him, Sergeant Pifer, a 6'4 and 320 lbs man, tackled Pelton, who Sergeant Pifer conceded appeared to him to be 5 feet, 10 inches tall, weighing approximately 210-220 lbs and in his early 50s. Prior to tackling Pelton, Sergeant Pifer did not ask Pelton if he was armed and did not ask if he could pat him down. At the time of the tackle, all Pelton had done to warrant a belief that he presented a danger to the officers or others was pull his arm away from Sergeant Pifer. A juror could reasonably conclude that Sergeant Pifer's use of force in response was excessive under the Fourth Amendment. Sergeant Pifer's characterization of Pelton as angry and uncooperative would not necessarily compel a juror to think otherwise.

---

[8] We note that counsel for Defendant-Appellant's briefing misquoted *Graham* by omitting the word arrest: "whether he is actively resisting or attempting to evade arrest by flight."

**IV.**

**The district court erred in denying qualified immunity to Corporal Perdue against Pelton's failure-to-intervene claim.**

A reasonable juror could not find that Corporal Perdue's failure to intervene in Sergeant Pifer's use of excessive force was an unconstitutional violation of Pelton's rights. In order to sustain a failure-to-intervene claim for the use of excessive force by another officer, Pelton must show that "(1) [Corporal Perdue] observed or had reason to know that excessive force would be or was being used; and (2) [Corporal Perdue] had both the opportunity and the means to prevent the harm from occurring." *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

Pelton's claim against Corporal Perdue does not meet this standard because there is no evidence in the record, either adopted by the district court or presented by the plaintiff, from which a reasonable juror could conclude that Corporal Perdue was on notice that Sergeant Pifer was going to tackle Pelton. Corporal Perdue could fail to intervene only once he became aware that there was some conduct that required intervention. Under similar circumstances the Sixth Circuit has repeatedly held that officers are not liable under failure-to-intervene claims when the ostensible "opportunity and means" to intervene does not last long enough for the officer to "both perceive what was going on and intercede to stop it." *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) (citing *Durham v. Nu'Man*, 97 F.3d 862 868 (6th Cir. 1996); *Ontha v. Rutherford County*, 222 F. App'x 498, 506 (6th Cir. 2007)). Those cases, like this one, involve alleged uses of excessive force in a rapid sequence of events.

The case relied upon by Pelton, *Goodwin v. City of Painesville*, involved an allegation of an officer's "applying a taser for a prolonged period of time" while "other officers saw this and did nothing." 781 F.3d at 329. In that case, the record indicated that the officers had an

opportunity to intercede in the use of excessive force. *See id*. ("the instant case involves a prolonged application of force and the officers who allegedly failed to protect were directly involved").

The facts here are closer to *Burgess* than *Goodwin*. Pelton does not argue that Corporal Perdue could have physically intervened. Pelton argues, instead, that an objectively reasonable officer in Corporal Perdue's situation would have known that they were at the wrong house. A juror may well find that to be true. Even so, a juror could not reasonably jump from the fact that Corporal Perdue should have known he was at the wrong house to the conclusion that he "had reason to know that excessive force would be" used by Sergeant Pifer or that, once aware that Sergeant Pifer was using excessive force, he had "the opportunity and the means" to stop him, as required under *Goodwin*.

For these reasons we **AFFIRM** the district court's denial of summary judgment with respect to all but the failure-to-intervene claim brought against Corporal Perdue. On that claim, we **REVERSE** the district court and remand the case for proceedings consistent with this opinion.