Curtis M. MOORE, Plaintiff,

v.

Kent E. HOSIER, Officer Tom Sievers, Sgt. David Gillespie, Corporal Mike Tate, Officer Richard Loscomb, Officer Ginger Swick, Officer Kim Troutman, Joseph M. Squadrito, Allen County Sheriff, Allen County Sheriff's Department, and Unnamed Confinement Officers, Defendants.

Kent E. Hosier, Third Party Plaintiff,

v.

Allen County, Indiana, Third Party Defendant.

No. 1:97CV–229.

United States District Court, N.D. Indiana, Fort Wayne Division.

May 15, 1998.

Christopher C. Myers, Dennis H Geisleman, Myers and Geisleman, Fort Wayne, for Curtis M. Moore, plaintiff.

John R. Fleck, Fort Wayne, IN, for Kent E. Hosier, defendant.

John O. Feighner, Haller and Colvin, Fort Wayne, IN, for Allen County Sheriff's Department, Allen County, Ind., Joseph M. Squadrito, Tom Severs, Sgt. Gillespie, Captain Tate, Lascomb, Jennifer Swick, defendants.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the court for ruling on the Motion for Summary Judgment filed by the Defendants on March 6, 1998.[1]

---

1. According to the Defendants, the Motion for Summary Judgment was filed on behalf of Defendants Sievers, Gillespie, Tate, Loscomb, Swick, Townsend, and Sheriff Squadrito and the Allen County Sheriff's Department. Brief in Support of Defendants' Motion for Summary Judgment ("Defendants' Brief"), p. 2. Defendant Kent E. Hosier retained private counsel, a matter which is the subject of the Third Party Complaint. However, Moore has conceded that he has no cause of action against Gillespie, Tate, or Townsend, and states that their "names should be deleted from this suit ..." Plaintiff's Response to Defendants' Motion for Summary Judgment ("Plaintiff's Response"), p. 2. In addition, the caption of Defendants' brief contains the name of "Officer Kim Troutman." However, the caption to Defendants' Motion for Summary Judgment contains instead the name "Townsend," which also appeared on Moore's Amended Complaint. Furthermore, the record reflects that Troutman was never served in this case, although a confinement officer named Kimberly Troutman was deposed on December 18, 1997. In fact, on page 9 of their brief, Defendants specifically state that Troutman "is not a defendant in this case." In their reply brief, Defendants claim that when Moore stated in his response that he had no claim against "Townsend," he was probably referring to Troutman "since there is no Officer Townsend" employed at the ACCC. Defendants' Reply, pp. 1–2. Accordingly, the Defendants' Motion for Summary Judgment is granted as to Defendants Gillespie, Tate, and (to the extent that she could conceivably be considered a Defendant in this case) Troutman. Finally, Moore spelled Officer Sievers' name as "Severs," spelled Officer Loscomb's name as "Lascomb," and referred to Defendant Swick as "Jennifer." While a minor point, the court notes that the Defendants' Answer to Moore's Amended Complaint reveals that the correct spellings of the two officers' names are "Siev-

Plaintiff filed a response to the motion on April 6, 1998, and the Defendants filed a reply on April 15, 1998. Third Party Defendant, Allen County, Indiana, also filed a Motion for Summary Judgment on March 6, 1998, to which Third Party Plaintiff, Kent E. Hosier, filed a response on April 3. Allen County filed its reply on April 14. For the following reasons, the Motion for Summary Judgment filed by the Defendants is **GRANTED in part** and **DENIED in part**. The Motion for Summary Judgment filed by Third Party Defendant Allen County is **GRANTED**.

## STATEMENT OF FACTS

Plaintiff Curtis Moore brought this action under 42 U.S.C. § 1983, alleging that he was beaten and injured while being held at the Allen County Confinement Center ("ACCC"). Moore's involvement with law enforcement began on March 11, 1997, when Fort Wayne Police Officers arrested him after receiving a phone call from Moore's aunt, who told Police that her nephew was acting strangely. Moore admits that he was under the influence of an illegal substance at the time and that he could not control himself. When the Police Officers arrived at the scene, Moore fled on foot. The Officers caught Moore and sprayed him with pepper spray in an effort to subdue him. Moore was handcuffed and placed in the back seat of a squad car. While seated in the car, Moore kicked the safety window in the car and damaged it. Moore was then transported to the Allen County Lock–Up in the Fort Wayne City–County Building. Moore alleges that while he was being held at the Lock–Up he was involved in an altercation with unidentified Officers who hit him in the eye. After being processed at the

Lock–Up, Moore was transported to the ACCC. Because of the fact that Moore was acting strangely, he was placed in a cell by himself beginning at 8:00 p.m. on March 11. The cell contained a camera that allowed jail personnel to observe Moore. On the evening of March 12, 1997, Moore placed a blanket over the camera and Confinement Officer Hosier was instructed to remove it. What occurred next is the subject of some dispute. The Defendants maintain that when Hosier approached Moore's cell Moore became combative and had to be sprayed again with pepper spray and handcuffed to a restraining chair.[2] It is also undisputed that after the pepper spray was used and Moore was placed in the restraining chair, he was transported to a shower room to be decontaminated. The Defendants maintain that during and after the shower Moore continued to struggle with officers and spit repeatedly. Moore contends that he was not being combative or unruly, and that he was spitting only while in the shower due to all the water he was getting in his face and mouth. He maintained that he was not fighting with officers and did not attempt to spit on any officer. Moore claims that he was beaten severely nonetheless. This lawsuit arises out of that altercation on March 12, 1997.

The Defendants do not dispute that an altercation took place and that Moore was beaten. However, they maintain that it was Defendant Kent Hosier who "repeatedly hit [Moore] in the face and on the head …" and that "Hosier's actions were inappropriate, illegal, and contrary to the training and policies of the [Allen County Sheriff's Department]. Hosier's actions constituted criminal assault and battery

ers" and "Loscomb," and that Defendant Swick's first name is Ginger. Therefore, as far as the court can ascertain, the Defendants in this case include Hosier, Sievers, Loscomb, Swick, Sheriff Squadrito and the Allen County Sheriff's Department, and other unnamed confinement officers.

**2.** A videotape taken from a camera mounted in the jail's receiving area, where Moore was

being housed, shows officers struggling with Moore, handcuffing him, and strapping him into a restraining chair. While the tape does not show an officer spraying pepper spray, the sounds on the tape (including much coughing) make it clear that spray was used and affected some of the officers present as well as Moore, a fact that is not in dispute.

against Moore." Defendants' Brief, p. 2. As more fully set forth below, all of the Defendant officers in this case have testified that Hosier hit Moore repeatedly with a closed fist and that Moore was bleeding profusely. Moore was eventually taken by ambulance to Lutheran Hospital, where he was treated for a fractured nose. Defendants also state that Hosier was fired from his job as a Civilian Confinement Officer as a result of this incident and that the Sheriff's Department "turned the matter over for a criminal investigation." *Id.* The Defendants argue that they are not liable in any capacity and that Hosier's actions constituted intentional misconduct.

In his Amended Complaint, Moore asserted five counts against the Defendants. Count One alleged that unnamed confinement officers at the Allen County Lock–Up beat Moore and that their actions "constitute[d] an unlawful seizure and cruel and unusual punishment" and violated Moore's Fourth, Eighth, and Fourteenth Amendment rights. Amended Complaint, p. 3. The unnamed officers were sued in their individual capacities. Count Two contained similar constitutional claims against Hosier, Sievers, Gillespie, Tate, Loscomb, Swick, and "Townsend," also in their individual capacities. *Id.* Count Three alleged that the actions of the officers named in Count Two constituted false imprisonment, assault and battery, unlawful detainment, invasion of privacy, and a violation of the Indiana Tort Claims statute (claims over which Moore requests this court exercise supplemental jurisdiction). *Id.*, p. 4. Count Four names Allen County Sheriff Joseph Squadrito, whom Moore claims is liable for the incident under the doctrine of *respondeat superior.* *Id.* Moore also claims that Squadrito "was negligent in his hiring, training and retention of Defendant, Kent E. Hosier." Finally, Count Five is actually Moore's request for punitive damages. As stated previously, Moore acknowledged in his response to the Motion for Summary Judgment that he has no claim against Officers Gillespie, Tate, and "Townsend."

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the nonmoving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High Sch. Dist. No. 204,* 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in

favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511.

## DISCUSSION

### I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

#### A. Count One.

Count One of Moore's Amended Complaint is the subject of some confusion in this case. In it he alleges that he was beaten for no reason by unknown confinement officers at the Allen County Lock–Up on March 11, 1997. This allegation did not appear in Moore's Original Complaint. Defendant Sheriff's Reply Designation of Evidence, Exh. A. Also, Moore's Notice of Tort Claim which was sent on June 15, 1997, referred only to the incident with Hosier at the ACCC on March 12, 1997. *Id.* During his October 17, 1997 deposition, Moore testified that while being held at the Lock–Up he experienced "[n]o verbal swearing or nothing. No physical confrontations or nothing[.]" with any of the confinement officers. *Id.,* Exh. C., Moore Dep., p. 26. Nonetheless, Moore claims that unknown officers jumped on him, threw him to the floor, and hit him in the eye. *Id.* Moore did state that the officers were wearing "County uniforms." *Id.,* p. 27. Moore also stated that while at Lock–Up he was not sprayed with mace or pepper spray. *Id.,* pp. 26–27.

As Defendants point out, Moore's deposition testimony about the incident at the Lock–Up is rather confusing. He was unable to recall the date or time the incident occurred, the names of any officers involved, or exactly what transpired at the Lock–Up. *See generally, Id.,* pp. 25–28. On October 20, 1997, in the course of discovery, Defendants produced incident reports prepared by several confinement officers who were involved in an altercation with Moore at the Lock–Up on March 11. *Id.,* Exh. D. These officers include Dan Osborn, Jack Cain, and Kathi Gonzalez. *Id.* The reports all state that Moore was uncooperative in the Lock–Up, was resisting and struggling with officers, was sprayed with pepper spray, and was handcuffed. *Id.* Soon thereafter, Moore was transferred to the ACCC to be decontaminated and examined by a nurse. *Id.* Carol Butler, the nurse on duty at the ACCC, examined Moore on his arrival and noticed he had a small laceration under his eye. Plaintiff's Response, Butler Dep., p. 10. The Defendants note that "Plaintiff has never moved for leave of Court to file an amended complaint to name any of the officers working in the Allen County Lock–Up who were involved in the March 11, 1997, altercation." Defendants' Reply, p. 5. Also, there is no evidence, nor does Moore even allege, that Hosier, Sievers, Loscomb, or Swick were in any way involved in whatever transpired at the Lock–Up on March 11, 1997. Obviously, then, to the extent that any of those named Defendants could conceivably be considered Defendants with regard to Count One of the Amended Complaint they are entitled to a grant of summary judgment in their favor, and same is hereby granted.[3]

#### B. Count Two.

As stated previously, Moore's Amended Complaint includes a claim for violations of his Eighth Amendment right to be free from cruel and unusual punishment. The Eighth Amendment does, of course, protect prisoners against cruel and unusual punishment. U.S. Const. amend. VIII; *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). However, the Eighth Amendment applies only to convicted prisoners, while the constitutional rights of a pretrial detainee would be

---

**3.** The Lock–Up officers were served with summons in care of Defendant Sheriff Squadrito. The Summons listed the Defendants as "Unnamed Confinement Officers." Docket at 39. These Defendants were sued in their individual capacities. Amended Complaint, p. 3. The present motion for summary judgment was filed only on behalf of the Defendants named in footnote 1 of this Order. None of the Lock–Up officers who filed reports following the incident on March 11, 1997 filed any motions or appearances in this case.

protected by the 14th Amendment's due process clause. *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Duran v. Elrod,* 542 F.2d 998, 999–1000 (7th Cir. 1976); *Robinson v. Moses,* 644 F.Supp. 975, 980 (N.D.Ind.1986). It is undisputed that at the time of the incident in question, Moore was a pretrial detainee rather than a convicted prisoner. Consequently, Moore had a right to be free from *any* form of punishment while being held at the ACCC. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Defendants acknowledge in their brief that "pretrial detainees must arguably be afforded a higher standard than that provided by the Eighth Amendment." Defendants' Brief, p. 12 (citing *Bell*). Because pretrial detainees are convicted of no crime for which they may be presently punished, the conditions of their confinement must be justified on the basis of whether the conditions are "an incident of some other legitimate governmental purpose" such as ensuring the detainee's presence at trial. *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1351 (7th Cir.1985). Unconstitutional, punitive pretrial detention results from restrictions which are not reasonably related to the purpose of ensuring the presence at trial of pretrial detainees, or which are not reasonably related to confinement facility management. *Bell* at 536–537, 99 S.Ct. 1861. The 14th Amendment is breached when pretrial detention amounts to punishment. *Id.* In order to prevail on a 14th Amendment claim, a plaintiff must prove that the defendants "acted with deliberate or callous indifference, evidenced by an actual intent to violate [the plaintiff's] rights or reckless disregard for his rights." *Anderson v. Gutschenritter,* 836 F.2d 346, 349 (7th Cir.1988) (citing *Shelby County Jail Inmates v. Westlake,* 798 F.2d 1085, 1094 (7th Cir.1986)). And, as Moore points out, police officers may be liable under § 1983 if they fail to prevent a

fellow officer from inflicting injury on a citizen. Plaintiff's Response, p. 11 (citing *Yang v. Hardin,* 37 F.3d 282 (7th Cir. 1994)). In *Yang,* the Seventh Circuit explained that "[o]missions as well as actions may violate civil rights." *Yang,* 37 F.3d at 285. The court cited numerous cases from many circuits holding that police officers who fail to prevent an unnecessary or unreasonable use of force are liable under § 1983 notwithstanding the fact that they did not themselves participate in the use of force. *Id.* (citations omitted). The Seventh Circuit held that "*Byrd v. Brishke* [466 F.2d 6 (7th Cir.1972) ] remains the seminal case in this circuit on the duty of an officer to intervene to prevent summary punishment." *Id.* In *Byrd,* the Seventh Circuit held that "one who is given a badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Byrd,* 466 F.2d at 11. Finally, the Seventh Circuit held that:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang,* 37 F.3d at 285. The court further held that even where several officers may be present when unconstitutional punishment is meted out by a fellow officer, each officer present has an affirmative duty to act to prevent the violation. *Id.* at 286. Based on this, Moore contends that "Officers Sievers, Loscomb, and Swick either participated in the attack, or, were in a position to prevent it ..." Plaintiff's Response, p. 11.[4] Moore points out that Ho-

---

4. At this point in his response, Moore reiterates that "Officers Gillespie, Tate and Townsend [Troutman?] were not in a position

to help Moore or to prevent Hosier's attack;

sier testified in his deposition that he struck Moore while Sievers and Swick "were within touching distance" and, additionally, that Sievers himself "actually hit Plaintiff in the chest/solar plexus with his fist and knuckles." Plaintiff's Response, p. 12 (citing Hosier Dep., pp. 61 and 65–66). Hosier further testified that neither Sievers nor Swick attempted to stop him after he hit Moore in the nose the first time. Hosier Dep., p. 63. Hosier testified (as did the other officers) that this force was used in an attempt to get Moore to stop spitting at and attempting to kick the officers. Officer Sievers testified that Hosier hit Moore between 30 and 50 times. Sievers Dep., p. 44. Sievers also testified that he said to Hosier: "What the fuck are you doing?" Id., p. 45. Sievers also claimed that he told Hosier to "Stop it" and that "That's enough." Id. Sievers also testified that he placed his hand on Hosier's shoulder and told him to stop hitting Moore, but that Hosier "ignored me and didn't do anything." Id. Sievers stated that once Hosier stopped hitting Moore, Sievers began to exit the cell. Id., p. 46. At that point, a jail nurse came into the cell and, according to Sievers, Hosier "hit [Moore] two or three more times." Id. Officer Sievers claimed that he then got on a phone and called for assistance. Id. When asked why he left the cell after another officer had hit Moore so many times, Sievers testified that he "wanted to get somebody down there to help me get Hosier away from him." Id., p. 47. Sievers denied that he ever hit Moore himself.

As for Officer Loscomb, the Defendants admit that he assisted other officers in an attempt to "subdue and restrain Moore by using handcuffs and the restraining chair." Defendants' Brief, p. 15. Defendants also admit that Loscomb sprayed Moore with pepper spray in an attempt to subdue Moore and that he was ordered to do so by Sergeant Gillespie. Id. Once a nurse had administered a sedative, Loscomb began to leave the cell. Loscomb Dep., p. 35. Loscomb then heard Hosier make a comment about being spit on and, when Loscomb turned around, he "saw Officer Hosier strike [Moore] one time." Id. Loscomb admitted that he did not go back into the cell and attempt to restrain Hosier because "it appeared to me that the situation was under control." Id., p. 37. The Defendants maintain that "Officer Loscomb's use of the pepper spray and other use of force in helping subdue and restrain Moore was in response to a reasonable security threat caused by Moore's continued resistance." Defendants' Brief, pp. 15–16.

Officer Swick was also deposed in this case. She stated that she went to the receiving area from "downstairs" when she heard a "signal 15 call," which is a signal that an officer needs assistance. Swick Dep., p. 13. When she arrived, she "observed Officer Hosier in the cell and Inmate Moore on the floor bleeding, well, covered with blood." Id., p. 14. Swick stated that she left the cell at that point to retrieve gloves for herself and the other officers. Id., p. 17. She returned to the cell and handed each officer a pair of gloves. Id. She stated that Moore was not struggling at that point and that there was nothing going on in the cell. Id., p. 19. Swick testified that she then left the cell to ensure that an ambulance had been called. Id., pp. 20–21. Swick did not state that she ever hit or otherwise touched Moore, or that she witnessed Hosier strike Moore.

█ Obviously, there is conflicting evidence in the record. Moore testified that he was hit repeatedly by confinement officers, although Hosier is the only officer he identified by name. Moore dep., pp. 42, 51 and 78. Hosier, who does not deny hitting Moore,[5] stated in his deposition that both Sievers and Swick witnessed the incident and did nothing. As set forth above, Siev-

---

therefore, Plaintiff concedes that summary judgment should be granted in their favor."

5. Not only does Hosier admit to striking Moore out of anger, he further conceded that his actions were improper and unlawful. Hosier Dep., p. 80.

ers admitted that he witnessed Hosier hit Moore and that he attempted, at least to some degree, to stop it. Swick's deposition testimony indicates that she arrived at the scene only after everything had apparently ended and that she made sure an ambulance had been called. Loscomb also admitted that he saw Hosier hit Moore (albeit it only once according to him) but that he left the cell because he believed the situation was under control. Moore maintains, however, that "Sievers, Loscomb, and Swick ... had the opportunity to prevent the further attack upon Plaintiff by grabbing Hosier, tackling him, laying on top of Moore to prevent the beating, hitting Hosier or just staying in the same room—but none of this was done." Plaintiff's Response, p. 13. Moore further contends that the "officers had to know, from what they heard and what they saw, that excessive force was being used and that Hosier was committing a constitutional violation against Moore; *and* these officers had the opportunity to intervene to prevent continued harm from occurring to Moore. They failed; they are liable; summary judgment cannot be granted." *Id.*, pp. 13–14.

Thus, the court is presented with different versions of what occurred on the evening of March 12, 1997. While it is not disputed that officers may be liable under § 1983 for failing to intervene to prevent another officer from using unreasonable force, the Defendants maintain that they did in fact attempt to intervene in some fashion. Sievers, for example, stated that he yelled at Hosier, attempted to grab Hosier's shoulder and, when he realized that he "could not alone physically stop Hosier ... put out a call for the assistance of other Confinement Officers." Defendants' Brief, p. 17. Thus, Sievers argues that "he acted in good faith to stop Hosier." *Id.* Moore paints a picture of officers witnessing a beating and doing virtually nothing to stop it. The Defendants present a picture of an unruly inmate being subdued by officers, a single officer losing his temper (to say the least) and hitting the inmate repeatedly, and other officers rushing around to restore order and call an ambulance. The videotape submitted by Moore (as discussed in more detail below) seems to support the Defendants' position that Moore was being unruly and uncooperative, despite Moore's deposition testimony to the contrary.[6] It is unclear from the record exactly who witnessed the actual assault by Hosier and how much of it they may have seen. Finally, there is the directly contradictory testimony of Hosier and Sievers. Hosier claims that Sievers himself hit Moore at one point—an allegation Sievers denied. On its face, this appears to be a case of one officer losing all control and striking a handcuffed inmate. But granting summary judgment for the other officer/Defendants would require, at least to some degree, a credibility determination. As this court has noted before, "because summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task

---

**6.** Indeed, the record is replete with testimony supporting Defendants' contention that Moore was uncooperative. Carol Butler, the nurse who administered a sedative to Moore, stated that she "observed Curtis sitting in the chair just like spitting like, you know. He was spitting. And he didn't stop when they told him to stop." Defendants' Brief, Exh. A, Butler Dep., p. 18. She stated that she went to get permission to administer a sedative because Moore "was agitated and spitting and he wasn't responding to anyone." *Id.*, p. 20. Confinement Officer Troutman stated that she saw Hosier "having a problem with Curtis Moore. Curtis was trying to exit the cell." *Id.*, Exh. B, Troutman Dep., p. 20. Also, the videotape supplied by the Plaintiff shows Moore attempting to exit his cell at one point. Later, officers are heard repeatedly telling Moore to lie down and put his hands behind his back. After officers dragged Moore away from the cell and placed him on the floor in front of the front desk in the receiving area, Moore is seen turning over and trying to sit up after the officers told him to lie face down. The officers then grabbed Moore, turned him over (face down) and told him not to move.

only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994) (citations omitted). In the present case, there exists a material dispute about which Defendants witnessed Hosier's actions and, even more to the point, whether they had an actual opportunity to intervene but failed to do so. For this reason alone Moore's suit must survive the motion for summary judgment as it pertains to his claims against Sievers, Loscomb and Swick, although it appears to survive by the slimmest of reeds.

## C. Count Three.

 Moore has also claimed that the ACCC Defendants are liable to him for assault and battery, unlawful detainment, false imprisonment, and invasion of privacy. This claim (Count Three of his Amended Complaint) is based not on the beating by Hosier, but on Moore's allegation that the confinement officers "strapp[ed] Plaintiff to a chair with his arms tied behind his back and [beat] him about the face and body, and plac[ed] his face and mouth in from of a shower ..." Amended Complaint, p. 4. Moore brought this Count (or Counts?) under state law. It is not entirely clear what this Count actually is.[7] The court is unaware of any intentional tort known as "unlawful detainment." After rather extensive research, the court did find the term used in one case where a pretrial detainee was held in jail for 13 hours after a court ordered his discharge. *Simpson v. Sheahan*, 104 F.3d 998 (7th Cir.1997). But that case involved a 14th Amendment claim brought under § 1983 as a result of the wrongful prolonged detention of the plaintiff and was not an action for a tort known as "unlawful detainment." Accordingly, the Defendants are entitled to summary judgment on Moore's "claim" of unlawful detainment. As to Moore's invasion of privacy claim, the facts of this case do not support any

such claim. Under Indiana law, the tort of invasion of privacy consists of:

> The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

*Jones v. Bowman*, 694 F.Supp. 538, 553 (N.D.Ind.1988) (citing *Continental Optical Co. v. Reed*, 119 Ind.App. 643, 86 N.E.2d 306, 308 (1949)). The *Jones* case was also a § 1983 action brought against a county sheriff. The plaintiff contended that she was wrongfully detained in a county jail and was subjected to an unconstitutional strip search. It was the strip search that was the basis of her invasion of privacy claim. Judge Miller held that "the facts as alleged in Ms. Jones' cause of action do not fall within [the] definition [of that tort] and, accordingly, do not give rise to a cause of action for invasion of privacy under Indiana law." *Id.* The same holds true in the present case. Therefore, the Defendants are entitled to summary judgment on Moore's claim for invasion of privacy.

 As to Moore's claim for false imprisonment, this too must fail. Again, the court's research revealed that virtually all claims for false imprisonment brought by pretrial detainees stemmed from allegations that the actual incarceration of the plaintiff was illegal. Moore does not contend that his arrest or incarceration were illegal. Rather, he bases his false imprisonment claim on the fact that he was handcuffed, strapped into a restraining chair and taken to the shower room in the receiving area of the ACCC. However, the evidence is clear that this was done because Moore was being uncooperative and Officer Loscomb was ordered to utilize pepper spray to subdue Moore. As dis-

---

7. The Defendants argue that "Moore's claims under Count III are nothing more than a restatement of his allegations that the ACCC Defendants used excessive force against him." Defendants' Brief, p. 18.

cussed previously, when Loscomb sprayed the pepper spray it atomized, meaning that it clouded the immediate area. Defendants' Brief, Exh. D., Loscomb Dep., p. 20. In the videotape, several officers can he seen and heard coughing for quite some time after the pepper spray was used. Moore was strapped into the restraining chair and taken to the shower area not for purposes of punishment, but so that he could be decontaminated with cold water. *Id.*, Exh. E, Sievers Dep., pp. 25–29. Sievers stated that Moore was placed in the restraining chair and taken to the showers instead of being washed at a sink "because he was being combative and spitting, they didn't—we didn't really want to take him out of the chair because we didn't want to have to fight him. And we didn't want him to get hurt and we didn't want us to get hurt." *Id.*, pp. 24–25. These facts and the evidence presented by Moore simply do not support a claim for false imprisonment and the Defendants are entitled to summary judgment on that claim.

 Finally, Moore also included in Count Three of his Amended Complaint a state law claim for assault and battery stemming from the restraining chair/shower incident. Again, the facts do not support such a claim. The facts and evidence discussed above, including the videotape, reveal that Moore was indeed "manhandled" by the officers. However, the pepper spray and restraining chair were used to subdue Moore, who was being uncooperative and who by all accounts was acting strangely while held at the ACCC. As Defendants point out, " '[m]aintaining institutional security and preserving institutional order are essential goals that may require limitation or retraction of the retained rights of both convicted prisoners and pretrial detainees.' " Defendants' Brief, p. 17 (quoting *Bell*, 441 U.S. at 546, 99 S.Ct. 1861). Under the circumstances of the present case, while the officers' treatment of Moore may have been somewhat rough, it was clearly not unnecessary or unprovoked. There is clearly quite a difference between using reasonable force to subdue an inmate and committing the intentional

tort of battery against that inmate. The evidence reveals that it was the former situation that occurred when certain of the Defendants handcuffed Moore and strapped him in a restraining chair. Accordingly, the Defendants' are entitled to summary judgment on Moore's claim for assault and battery.

### D. Count Four.

 Moore also asserts that Sheriff Joseph Squadrito is liable to him "under Indiana Tort law." Amended Complaint, p. 4. Moore claims that Squadrito, as Sheriff of Allen County, is liable for the actions of the confinement officers under the doctrine of *respondeat superior.* He also claims that Squadrito was "negligent in his hiring, training, and retention of Defendant, Kent E. Hosier." *Id.* Moore claims that "Officers Sievers, Loscomb, and Swick—as well as Hosier—were all acting within the scope of their employment ..." when the incident occurred on March 12, 1997. It is well established that an employer may be vicariously liable for the wrongful acts of an employee where those acts are committed within the scope of employment. *Stropes v. Heritage House Childrens Ctr.*, 547 N.E.2d 244, 247 (Ind. 1989). On the other hand, an employer is generally *not* vicariously liable for the wrongful act when the employee committed it of his own volition and evidenced " 'no intention to perform it as part of or incident to the service for which he is employed ...' " *Id.* (quoting *Gomez v. Adams*, 462 N.E.2d 212, 223 (Ind.App. 1984)). "However, an employee's wrongful act may still fall within the scope of his employment if his purpose was, to an appreciable extent, to further his employer's business, even if the act was predominately motivated by an intention to benefit the employee himself." *Id.* The Defendants argue that Hosier's intentional beating of Moore was not sufficiently related to the furtherance of the business of the Allen County Sheriff's Department so as to fall within the scope of his employment. Defendants' Brief, pp. 20–21; Defendants'

Reply, pp. 16–19. However, Moore points out (and Defendants acknowledge) that an employer may even be held vicariously liable for an intentional criminal act committed by an employee when "the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope." *Stropes,* 547 N.E.2d at 247. In *Kemezy v. Peters,* 622 N.E.2d 1296 (Ind.1993), the Indiana Supreme Court reaffirmed its holdings · in *Stropes* and *Gomez* holding again that "[e]ven willful or wanton behavior does not necessarily remove one from the scope of his employment." *Kemezy,* 622 N.E.2d at 1298. The court also noted that "[t]he question of whether the tortious acts of an employee are within the scope of his employment is usually a question of fact ... but may be determined as a matter of law." *Id.*

In the present case, Moore argues that "[t]here is no question but that Hosier's conduct was in furtherance of the Sheriff's business of controlling inmates and helping his fellow officers control inmates." Plaintiff's Response, p. 16. Moore claims that the battery committed by Hosier "was so closely associated with his daily duties of controlling inmates, it falls within the scope of his employment for the Sheriff." *Id.* Finally, Moore argues that all ACCC officers are permitted, under certain circumstances, to use force against inmates. "That Hosier used the force improperly does not mean that he was acting outside the scope of his employment, but rather, he was merely acting improperly within the scope of his employment." *Id.,* p. 17. For their part, the Defendants argue that "[t]here is no question that at the precise moment when Hosier entered cell H–1, he was authorized to be there and that he presumably was acting to further the Sheriff's Department business—i.e., maintain the security of the jail and control disruptive inmates. However, Plaintiff then makes the leap of faith to conclude his argument that the alleged criminal act of battery against Moore was so closely associated with his daily duties of controlling inmates that it falls within the scope of his

employment for the Sheriff." Defendants' Reply, p. 18. Defendants also point out that in his deposition Hosier admitted that he was aware of the Sheriff's Department policy that if an officer used excessive force on an inmate "we had to make sure that we maintained conduct inside the rules or we could be prosecuted." Defendant Sheriff's Reply Designation of Evidence, Exh. G., Hosier Dep., p. 19. In addition, Defendants argue that the Sheriff's Department had adopted a Use of Force Policy that stated: "Members who cannot or will not comply with this policy are considered to be acting outside the color of law and subject themselves to disciplinary action up to and including termination as well as the possibility of criminal and civil liability." Defendants' Brief, Exh. H., Squadrito Aff., p. 2.

 It is clear that the Sheriff's Department eschews the use of excessive force except in extraordinary circumstances and that Hosier's actions were not authorized. But under the controlling Indiana case law, that may not take Hosier's admittedly wrongful act out of the scope of this employment. In *Gomez,* an employee of a private security company arrested an individual and confiscated his identification, in accordance with the company's policy. The employee then kept the confiscated identification rather than turn it over to the company and used it to cash a check onto which he had forged the arrestee's name. The arrestee, Adams, sued the security company on a *responde-at superior* theory and a jury found in his favor. While the court of appeals reversed the judgment as to the forgery, finding that it was "divorced in time, place, and purpose from [the officer's] employment duties" (*Gomez,* 462 N.E.2d at 223) it nonetheless held that the company could be found liable for the conversion since "[t]here was sufficient evidence for the jury to reasonably conclude that [the officer] was within the scope of his employment when he converted the check-cashing card to his own use." *Id.* at 225.

The *Stropes* case is even more analogous and instructive, and a thorough analysis of it is warranted here. In that case, the Indiana Supreme Court concluded that the question of the defendant's liability under *respondeat superior* should have been resolved by a jury even though the employee's act seemed on its face to be completely outside the scope of his employment. *Stropes*, 547 N.E.2d at 249. In that case the employee, Griffin, was a nurse's aide in a center for mentally retarded children. The center was sued after Griffin sexually molested a young patient at the center. In concluding that the question of the center's liability should have gone to a jury, the Indiana Supreme Court reasoned as follows:

> The question of employer liability under respondeat superior here should have gone to trial as it did in *Gomez* and *El Aguila*.[8] Like the employees in those cases, Heritage's employee committed some acts unquestionably within the scope of his employment. Griffin began the episode by performing a fully authorized act, stripping the sheets from David's bed prior to changing the bedding. He was also authorized to undress David Stropes and to touch his genitals and other parts of his body when bathing him and changing his clothes.... Like the conversions committed by the *Gomez* and *El Aguila* employees, it is beyond question that the abuse David suffered at Griffin's hands was unauthorized by Heritage and committed for Griffin's own gratification.

> The fact that this was a sexual assault is not per se determinative of the scope of employment question. A blanket rule holding all sexual attacks outside the scope of employment as a matter of law because they satisfy the perpetrators' personal desires would draw an unprin-

cipled distinction between such assaults and other types of crimes which employees may commit in response to other personal motivations, such as anger or financial pressures. Rather, the nature of the wrongful act should be a consideration in the assessment of whether and to what extent Griffin's acts fell within the scope of his employment such that Heritage should be held accountable.

Rape and sexual abuse constitute arguably the most egregious instances of wrongful acts which an employee could commit on the job and lend themselves to arguably the most instinctive conclusion that such acts could never be within the scope of one's employment, yet other courts have recognized that the resolution of the question does not turn on the type of act committed or on the perpetrator's emotional baggage accompanying the attack. Rather, these courts indicate that *the focus must be on how the employment relates to the context in which the commission of the wrongful act arose.*

*Stropes*, 547 N.E.2d at 249 (italics added). In the present case, the Defendants gallantly attempt to distinguish the *Stropes* case. They "acknowledge that this extraordinary decision could serve as a basis for imposing liability for a criminal battery under certain circumstances such as occurred in the *Stropes* case. Defendants' argument in this case is that the training of Officer Hosier, the policies of the Department, and the particular circumstances in this case are sufficient for this Court to determine as a matter of law that the criminal battery actions of Hosier were not employee actions authorized by the Sheriff's Department." Defendants' Reply, pp. 16–17. The Indiana Supreme Court apparently did not consider *Stropes* to be as

---

8. In *Tippecanoe Beverages v. S.A. El Aguila Brewing Co.*, 833 F.2d 633 (7th Cir.1987), the Seventh Circuit, relying on *Gomez,* affirmed a judgment against the defendant after one of its employees converted a cashier's check he had received from Tippecanoe in payment for a shipment of beer. The Seventh Circuit held

that the transaction itself was clearly within the scope of the employee's duties since he was authorized to receive such payment and, consequently, a reasonable jury could have found that the subsequent conversion, while wrongful, was nonetheless also within the scope of employment.

extraordinary or factually isolated as the Defendants would like to believe, as it specifically reaffirmed its reasoning in that case in the *Kemezy* case, which was decided four years after *Stropes* and which involved the use of excessive force by police officers during an arrest. This court, in light of these cases, cannot hold that as a matter of law Hosier's actions were outside the scope of his employment. It is undisputed that the incident involving Moore occurred in a relatively short time frame (the videotape begins with Hosier approaching Moore's cell and Moore attempting to exit, and ends approximately one hour later when Moore is carried out on a stretcher). Within that period of time, in which the officers attempted to subdue him, Moore was cuffed, sprayed with pepper spray, placed in the restraining chair, showered, and given a sedative. In the midst of all of this Moore was assaulted by Hosier. The situation, at least as it pertains to the doctrine of *respondeat superior*, might arguably have been different if Moore had been subdued, was cooperating, and Hosier committed an unprovoked attack an hour later. But that is not what happened. Hosier's attack was not "divorced in time, place and purpose" from his and the other officers' use of force in subduing Moore, something that is clearly within the scope of employment of confinement officers in a jail. Thus, the facts on which Moore bases his *respondeat superior* claim against the Sheriff's Department present a genuine issue of material fact that must be resolved by a jury. This is especially true in light of the court's analysis of Moore's § 1983 claim. As the viability of Moore's constitutional claim can only be determined after a jury hears all the evidence about what exactly took place and makes the necessary credibility determinations, so too does the issue of whether Hosier's actions were within the scope of his employment turn largely on that same evidence. Accordingly, the Defendants' motion for summary judgment on the issue of the liability of Sheriff Squadrito under the doctrine of *respondeat superior* must be denied.

Finally, Moore alleges in Count Four that "Sheriff Squadrito was negligent in his hiring, training and retention" of Officer Hosier. The Defendants acknowledge that "Indiana recognizes the tort of negligent hiring and retention of an employee." Defendants' Brief, p. 21 (citing *Levinson v. Citizens Nat. Bank of Evansville*, 644 N.E.2d 1264 (Ind.App. 1994) and *Frye v. American Painting Co.*, 642 N.E.2d 995 (Ind.App.1994)). In *Levinson*, the court wrote that "Indiana has long recognized a cause of action for negligent hiring and retention of an employee." *Levinson*, 644 N.E.2d at 1269 (citations omitted). The court explained that "[i]n order to prevail on this theory, the plaintiff must show that the defendant employer negligently retained an employee who the defendant knew was in the habit of misconducting himself." *Id.* (citations omitted). In *Frye*, the court noted that "Indiana has adopted the *Restatement (Second) of Torts* § 317, applicable in such cases." *Frye*, 642 N.E.2d at 998. The *Frye* court then quoted the comment to § 317 when discussing negligent retention. That states:

> c. *Retention in employment of servants known to misconduct themselves.* There may be circumstances in which the only effective control which the master can exercise over the conduct of his servant is to discharge the servant. Therefore the master may subject himself to liability under the rule stated in this Section by retaining in his employment servants who, to his knowledge, are in the habit of misconducting themselves in a manner dangerous to others.

*Id.* at 998–99. As to Moore's allegation that Squadrito was negligent in hiring Hosier, the entire claim is based on the fact that Hosier admitted he was fired from a job at North Manchester Foundry after he cut off part of a co-worker's hair during a dispute. Plaintiff's Response, p. 17; Hosier Dep., pp. 25–27. The Defendants do not dispute that they were aware of this incident, which according to Hosier took place about two years before his October 1997

deposition in this case. Hosier Dep., p. 26. However, Defendants argue that while such behavior is "certainly unfortunate ... [it] is not the kind of conduct which disqualifies someone from being hired as a confinement officer or for any other employment.... There is no evidence that [Hosier] struck or injured any person prior to the time that he was hired by the Allen County Sheriff's Department." Defendants' Reply, p. 20. Defendants go on to point out that at the time Hosier was hired, the Sheriff's Department not only did not have any knowledge of any prior assault or battery incidents involving him, but it also was aware that he had received an honorable discharge from the U.S. Army in 1988. *Id.* And, Hosier testified in his deposition that with the exception of the incident at the North Manchester Foundry he had never been disciplined by any other employer for any reason. Hosier Dep., p. 25. In order to be liable for negligent hiring, an employer must have "actual or constructive knowledge of the employee's propensity to commit a later act of violence." *Frye*, 642 N.E.2d at 999. Moore presents no authority to support his position that the fact that Hosier cut off some of a co-worker's hair during a dispute amounted to actual or constructive knowledge on the part of the Sheriff's Department that Hosier had a "propensity to commit a later act of violence" or "was *in the habit* of misconducting himself." Were that so, one could argue that jails and prisons could never hire any person who had ever been involved in any fight or other sort of physical altercation. In short, a reasonable jury could not conclude, based on a single isolated incident years earlier, that the Sheriff's Department knew or should have known that Hosier was likely to commit a violent assault and battery on an inmate sometime in the future. Accordingly, the Defendants, Joseph Squadrito and the Allen County Sheriff's Department are entitled to summary judgment on Moore's claim of negligent hiring.

 As to Moore's claim of negligent retention, he bases this claim also on one single incident that occurred at the jail. Plaintiff's Response, p. 17. Moore submitted the affidavit of Kevin Murtaugh, who was an inmate at the Allen County Jail in 1997. In his affidavit, Murtaugh alleged that he was attacked by a confinement officer at the ACCC on January 26, 1997. Murtaugh claims that the officer "grabbed my testicles with his left hand and my collar/throat with his right hand." Plaintiff's Response, Murtaugh Aff., ¶ 2. Murtaugh also claimed that the officer ran him into the wall of his cell. *Id.* Murtaugh claims that he sustained injuries during this altercation that persisted at the time of his affidavit in February of 1998. *Id.*, ¶ 7. Murtaugh claims in the second paragraph of his affidavit that the officer who allegedly assaulted him was Hosier. However, as Defendants point out in their reply, Murtaugh also states in his affidavit that at the time he was allegedly assaulted by a guard, he did not know the guard's name and identified him to another officer as "Officer Ulretch." *Id.*, ¶ 3. Later, on February 11, 1997, Murtaugh informed four other ACCC officers that Officer Ulretch had assaulted him. *Id.*, ¶ 4. When Murtaugh was asked to identify Ulretch he told the officers that Ulretch was not the guard who had assaulted him. *Id.* Murtaugh states that finally, in April of 1997, "Christopher Bolan identified Officer Hosier as the guard who assaulted me." *Id.*, ¶ 8. Thus, as Defendants point out, there is no evidence that the Sheriff's Department had any knowledge that Hosier allegedly assaulted Murtaugh until *after* the incident involving Moore. In the absence of any such evidence, no reasonable jury could conclude that the Sheriff's Department was negligent in its retention of Hosier between January 26, 1997 and March 12, 1997. It is also undisputed that following the incident with Moore, Hosier was in fact fired from his job at the ACCC. Accordingly, the Defendants argue that "[t]here is absolutely no evidence in this record that the Allen County Sheriff or the Sheriff's Department committed any act or omission which constitutes negligent reten-

tion of Officer Hosier." Defendants' reply, p. 22. The court agrees that the facts presented by Moore do not support a claim for negligent retention against the Sheriff or the Sheriff's Department and summary judgment is granted as to that claim.

■ Finally, Moore alleged in his Amended Complaint that the Sheriff's Department was liable to him as a consequence of its failure to properly train Hosier. In his response, however, Moore presents argument only on his negligent hiring and negligent retention claims. Nonetheless, as a failure to train claim is referenced in the Complaint, the court will address it only long enough to explain why the Defendants are entitled to summary judgment on that claim. The record is replete with evidence that the Allen County Sheriff's Department has in place, and had in place at the time of this incident, a procedure by which it trained incoming confinement officers in handling inmates— particularly as it pertained to the use of force. While the court determines that it is not necessary to discuss this training in detail in this Order, it is important to note that all of the officers deposed in this case testified that they received training from the Sheriff's Department on the use of force policy. Officers Troutman, Swick, Loscomb, Sievers, and Gillespie all testified that they had received training about such things as the use of force and when it is appropriate, civil rights education, proper techniques for the prevention of the transfer of blood-borne pathogens, suicide prevention, and/or CPR. As stated previously, it is undisputed that at the time of the incident with Moore the Sheriff's Department had in place a Use of Force Policy. That Policy specifically stated that "[m]embers are expected to use force only in a lawful and justifiable manner" and that "this means the unnecessary use of force or the use of force in an excessive or unreasonable amount or to use force in a cruel manner is an unjustified use of force and violates this policy." Defendants' Brief, Exh. H. The Policy then goes into much more detailed discussion about the use of force in specific circumstances. *Id.*

Most importantly, Defendant Hosier himself testified extensively about the training he received from the Sheriff's Department, including training on the use of force against inmates. Defendant Sheriff's reply Designation of Evidence, Exh. G., Hosier Dep., pp. 8–15 and 19. In addition, as also stated previously, Hosier admitted in his deposition that his actions against Moore were improper and illegal. There is no evidence that the Sheriff's Department was negligent in failing to properly train Hosier for his job as a confinement officer at the ACCC. Accordingly, the Sheriff and Sheriff's Department are entitled to summary judgment on that claim.

## II. THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

Defendant Kent Hosier filed a Third Party Complaint against Allen County, Indiana, on August 19, 1997. Hosier also filed a Notice of Tort Claim with the Allen County Board of Commissioners. Hosier alleged in that Complaint that the County wrongfully failed to provide him with a defense in this case and wrongfully denied him indemnification pursuant to the Allen County Legal Indemnification Program. The County filed a Motion for Summary Judgment on March 6, 1998, arguing that Hosier is not entitled to a defense or indemnification.

The County acknowledges that the Allen County Code contains a Defense and Indemnification Agreement. That Agreement states, in relevant part:

Chapter 1.

LEGAL INDEMNIFICATION PROGRAM

The County of Allen hereby agrees to defend and indemnify all of its elected and appointed officials, officers, and employees to the extent that liability is assessed against such persons which is not covered by other conventional insurance coverages; provided, however, that such coverage does not include acts done

by such officials or employees which are criminal in nature, outside the scope of employment or willful or wanton direct violations of laws, statutes, ordinances or regulations and for which the County would otherwise be additionally responsible because of the doctrine of respondeat superior.

## Chapter 2.
## DEFENSE

The County of Allen hereby agrees to provide a defense at its expense to any of its elected and appointed officials, officers and employees covered under Chapter 1 herein.

## Chapter 3.
## INDEMNIFICATION

The County of Allen hereby agrees to indemnify and save and hold harmless any of its elected and appointed officials, officers or employees from any and all losses or liabilities covered under Chapter 1 herein to the extent provided by law:

Third Party Defendant, Allen County, Indiana's, Motion for Summary Judgment ("Third Party Motion"), Exh. E. On July 10, 1997, the Allen County Attorney's Office sent a letter to Hosier informing him that the County determined he was "not covered by the Legal Indemnification Program, Allen County Code 1-4-1, for the reason that the allegations against you specifically allege acts done by employees which are criminal in nature, outside the scope of employment, or willful or wanton direct violations of laws, statutes, ordinances, or regulations." *Id.*, Exh. G. The letter further stated that "the County of Allen will not be indemnifying you or agreeing to pay any ... damages which could be assessed against you." *Id.* The County stated that it was incorporating the arguments of Sheriff Squadrito and the Allen County Sheriff's Department, as presented in the Defendants' Motion for Summary Judgment, "as part of the factual and legal basis in support of its motion for summary judgment with respect to the

Third Party Complaint." Third Party Defendant, Allen County, Indiana's, Legal Memorandum in Support of Motion for Summary Judgment ("Third Party Defendant's Brief"), p. 9. The County essentially repeats in its brief many of the legal arguments pressed by Squadrito and the Sheriff's Department, claiming that it is not liable for any damages that may be assessed against Hosier since his actions on March 12, 1997 constituted an intentional criminal act. The County argues that "the [Sheriff's Department] use of force policy properly defines the scope of employment for civilian confinement officers such as Mr. Hosier. When, as tragically occurred in this case, an officer clearly exceeds his authority and commits undisputed battery upon the person of an inmate, that officer is outside the scope of his employment and not subject to the Allen County Indemnification Policy." *Id.*, p. 11. In his response to the County's motion, Hosier, relying again on the *Stropes* and *Kemezy* cases, argues that his actions were in fact within the scope of his employment. He concludes that "*respondeat superior* exists and the Allen County Code ... provides for the defense and indemnification of all County employees." Third Party Plaintiff's Response, p. 4. The court, having already determined that a fact issue exists with regard to whether Hosier's actions were in the scope of his employment for purposes of the doctrine of *respondeat superior*, need not repeat that analysis here. But the fact that a jury could find that Hosier's actions were in fact within the scope of his employment does not automatically resolve the issue of indemnification.

The County presents two arguments in its motion. First, it claims that it is not required to defend or indemnify Hosier for alleged violations of federal civil rights statutes. The County notes that the Indiana Code specifically addresses such situations. The Indiana Code states, in relevant part:

If a present or former public employee ... is or could be subject to personal

civil liability for a loss occurring because of a non-criminal act or omission within the scope of his employment which violates the civil rights laws of the United States, the governmental entity ... shall ... pay any judgment, compromise, or settlement of the claim or suit when ... the governing body of the political subdivision determines that paying the judgment, compromise, or settlement is in the best interest of the governmental entity. The governmental entity shall also pay all costs and fees incurred by or on behalf of a public employee in defense of the claim or suit.

I.C. § 34–4–16.7–1. The County then cites the case of *Kapitan v. City of Gary, Indiana*, 12 F.3d 678 (7th Cir.1993). In that case, the Seventh Circuit expressly held that a governmental entity's decision whether to indemnify an employee is completely discretionary. The court held that I.C. § 34–4–16.7–1 states "that a governmental entity 'shall' pay judgments against employees, but only if the 'governing body' of that entity 'determines that paying the judgment ... is in the best interest of the governmental entity.' That combination makes indemnity voluntary." *Kapitan*, 12 F.3d at 680. The court went on to explain that "payment of costs and legal fees follows from the decision to indemnify the substantive liability; a governmental entity that decides not to indemnify also need not pay these ancillary expenses." *Id.* The Seventh Circuit concluded that the City of Gary, Indiana, was justified in refusing to indemnify a city police officer who had been sued pursuant to 42 U.S.C. § 1983. Therefore, argues the County in the present case, it had no obligation to indemnify Hosier against Moore's civil rights claims after determining that it would not be in the best interest of the County. Furthermore, I.C. § 34–4–16.7–1 refers to indemnification only for "non-criminal" acts committed "within the scope of ... employment ..." As the County points out, Hosier pleaded guilty on May 23, 1997, to a charge of misdemeanor battery stemming from the incident with Moore. Third Party Motion, Exh. F. Ho-

sier was ordered to pay a fine of $100 and received a one-year suspended sentence. *Id.* Thus, even if Hosier's actions were found to be within the scope of his employment, their criminal nature would also preclude indemnification under I.C. § 34–4–16.7–1. In his response, Hosier does not respond to the County's arguments concerning this Code section and Moore's federal civil rights claims. The County maintains that "Hosier may have conceded in his Response Brief that he is not able to obtain indemnification for any civil rights judgment or defense of the civil rights claims in this case." Third Party Defendant's Brief, p. 8. While Hosier did not expressly concede the point, it is nonetheless clear from the language of the Code section and the holding in *Kapitan* that Hosier is not entitled to indemnification against Moore's federal civil rights claims. Accordingly, the County is entitled to summary judgment in its favor on that issue.

In his response, Hosier argues that he is entitled to the benefit of the Allen County Code Indemnification Agreement with regard to Moore's state law tort claim against him arising out of the same incident. Hosier claims that because his conduct was, according to him, within the scope of his employment, *"respondeat superior exists"* and therefore he is entitled to indemnification. However, his argument fails for two reasons. First, Indiana Code section 34–4–16.5–5 provides for defense and indemnification of employees of governmental entities who are sued under the Indiana Tort Claims Act. That section provides, in relevant part:

[A] governmental entity shall pay any judgment, compromise, or settlement of a claim or suit against an employee when the act or omission causing the loss is within the scope of his employment, regardless of whether the employee can or cannot be held personally liable for the loss and when ... the governing body of the political subdivision ... determines that paying the judg-

ment, compromise, or settlement is in the best interest of the governmental entity.

I.C. § 34–4–16.5–5(c). Obviously, this section contains language.very similar to that in § 34–4–16.7–1. In fact, the Seventh Circuit held in *Kapitan* that both sections make indemnity voluntary. *Kapitan,* 12 F.3d at 680. Thus, the County was free to decide *not* to indemnify Hosier against Moore's state tort claim. In addition, the Allen County Code Indemnification Agreement specifically states that it does not apply to "acts ... which are criminal in nature, outside the scope of employment or willful or wanton direct violations of laws, statutes, ordinances or regulations ..." Thus, the County argues, even assuming that Hosier's actions could be found to be within the scope of his employment, the fact that those actions were criminal would constitute an exception to the indemnification program and provide another reason for the County to refuse to provide Hosier with a defense and indemnification. Accordingly, argues the County, "the Board of Commissioners of Allen County, Indiana, in the exercise of its governmental authority, determined that employees who commit criminal acts, such as Mr. Hosier did in this tragic instance, are not entitled to indemnification by the Allen County taxpayers." Third Party Defendant's Brief, p. 17.[9] Accordingly, Hosier's argument that his actions were within the scope of his employment does not suffice to create a fact issue regarding the County's refusal to provide him with a defense and indemnification. Therefore, the County's motion for summary judgment is granted.

9. Hosier's attempt to refute the fact that his actions were criminal is unavailing. He states that "[e]ven though [he] entered a plea of guilty to misdemeanor battery ... he may not have been guilty. Mr. Hosier was not advised at the time of his guilty plea by his then counsel that as he had good reason to believe that he had been the victim of felony battery by bodily waste by [Moore] ... he had

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by the Defendants is **DENIED** with respect to Moore's § 1983 claims against Sievers, Loscomb and Swick; **GRANTED** as to Moore's state law claims of assault and battery, unlawful detainment, false imprisonment, and invasion of privacy; **DENIED** as to Moore's state tort claim against Sheriff Squadrito under the doctrine of *respondeat superior;* and **GRANTED** as to Moore's state law claims for negligent hiring, negligent retention, and failure to train. Additionally, the Motion for Summary Judgment filed by Third Party Defendant Allen County, Indiana, is **GRANTED.**

a self-defense defense [sic]." Third Party Plaintiff's Response, p. 2. Whether or not Hosier had any valid defense to the battery charge is speculation. Hosier never appealed his conviction. He voluntarily pleaded guilty to the charge stemming from his striking of Moore, so the fact that his actions were criminal cannot be disputed now.